**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 12, 2009

Charles R. Fulbruge III
Clerk

No. 08-20516

In The Matter of: SEAQUEST DIVING LP; SEAQUEST GENERAL
HOLDINGS LLC

Debtors

-------------------------------------------------------------------------------------------------------------

SEAQUEST DIVING LP; SEAQUEST GENERAL HOLDINGS LLC; RYAN
MARINE SERVICES INC; EMMONS & JACKSON PC

Plaintiffs-Appellees

v.

S & J DIVING INC; STANLEY EARLE JONES

Defendants-Appellants

Appeal from the United States District Court
for the Southern District of Texas

Before BARKSDALE, DeMOSS, and STEWART, Circuit Judges.

DeMOSS, Circuit Judge:

In this appeal, we must address whether a $2,742,014 unsecured claim
based on a state court judgment is subject to mandatory subordination under 11
U.S.C. § 510(b) because it arose from the rescission of a purchase or sale of a
security of the debtor. This is an issue of first impression in this Circuit. For
the reasons stated in this opinion, we affirm the decision of the bankruptcy court

-1-

subordinating the claim.

## I. Factual & Procedural Background

### A.    Facts

The following is a chronology of events that led to the Chapter 11 bankruptcy filing of SeaQuest Diving, LP (SeaQuest LP) and SeaQuest General Holdings, LLC (SeaQuest LLC) (collectively "SeaQuest" or "the debtors"). SeaQuest provided underwater oilfield services to offshore oil and gas companies.

Prior to SeaQuest's formation, Carroll LeBoeuf, James McClaugherty, and Todd Steele were employed in the underwater oilfield services industry. In late 2005, they sought to form a business of their own in which to invest their industry contacts and sweat equity. In early 2006, these three individuals were introduced to Stanley Jones, the president and owner of S&J Diving, LP (S&J). Over a period of several months, the parties negotiated the formation of a new company—SeaQuest—that would pool the assets, industry contacts, and combined expertise of all the parties. On June 1, 2006, the parties executed a series of agreements that created SeaQuest.

SeaQuest was structured as a limited partnership with a limited liability company serving as the general partner. The limited partners of SeaQuest LP were members of SeaQuest LLC, which managed the venture. S&J contributed substantially all of its corporate assets, valued at approximately $6,000,000, in exchange for all the Class A shares in SeaQuest LP. Because they were given in exchange for a significant capital contribution, the Class A shares were entitled to preferential distributions under the limited partnership agreement. In exchange for their contributions of knowledge and labor, LeBoeuf, McClaugherty, and Steele each received an equal number of Class B shares in SeaQuest LP. LeBoeuf, McClaugherty, Steele, and Jones each received a 25%

membership interest in SeaQuest LLC in exchange for $250.

The parties executed the following instruments on June 1, 2006: (1) the Asset Contribution and Transition Agreement (ACTA), (2) the Company Agreement of SeaQuest General Holdings, LLC a Texas Limited Liability Company (LLC Agreement), and (3) the SeaQuest Diving, LP Agreement of Limited Partnership (LP Agreement). Pursuant to the ACTA, S&J agreed to assign its lease to SeaQuest, which would then operate its new business out of the building that formerly housed S&J's operations. S&J also agreed to contribute: (1) its fixed assets, such as furniture, fixtures, displays, equipment, leasehold improvements, signage, supplies, and all of S&J's tangible personal property; (2) its records and files; (3) its rolling stock and vessels; (4) its equipment leases, agreements, contracts, and rights thereunder; (5) its intellectual property; (6) its permits, licenses, orders, registrations and certificates obtained from governmental agencies; (7) its accounts receivable, represented to be approximately $2,550,000; (8) its cash on hand; and (9) its keys, passwords, and telephone numbers.

Before the ink on the paper was dry, serious conflicts arose between Jones and his three new partners regarding the operation of SeaQuest. On August 1, 2006, LeBoeuf, McClaugherty, and Steele, on behalf of SeaQuest, filed their first state court lawsuit against Jones and S&J. In this first lawsuit, SeaQuest alleged that Jones (1) failed to transfer S&J's assets pursuant to the ACTA; (2) refused access to S&J's books and records; (3) refused SeaQuest employees access to the business premises; (4) continued to use S&J letterhead on SeaQuest paperwork, including checks, financials, and invoices; (5) padded the payroll with unproductive family members; (6) materially overstated the amount and collectability of S&J's accounts receivable; and (7) materially overstated the value of S&J's contributed assets by roughly $2,000,000. The following day, on

-3-

August 2, 2006, the parties entered into a handwritten agreement pursuant to Rule 11 of the Texas Rules of Civil Procedure (August 2 Settlement Agreement). The first lawsuit was dismissed on August 3, 2006.

The August 2 Settlement Agreement provided, in relevant part, that (1) S&J would provide the limited partners access to S&J's premises and its records; (2) the debtors "are exercising their right to buy out S&J"; (3) the parties would have sixty days from August 3, 2006 to consummate the buyout transaction; (4) S&J's receivables would be used to cover SeaQuest's monthly overhead until the buyout transaction closed; and (5) SeaQuest would be jointly managed by both the debtors and S&J until the buyout transaction closed.

The parties were unable to complete the buyout contemplated by the August 2 Settlement Agreement. LeBoeuf, McClaugherty, and Steele blamed this failure on Jones's intransigence. On September 28, 2006, the debtors filed a second state court lawsuit against Jones and S&J. In this second lawsuit, the debtors alleged that Jones (1) refused to cooperate with the debtors and diverted money from SeaQuest's bank accounts; (2) unilaterally cancelled the health insurance of SeaQuest's employees; (3) sent dive teams on unapproved jobs; (4) violated the confidentiality provision of the August 2 Settlement Agreement; (5) denied SeaQuest access to S&J's books and records, thus preventing completion of the buyout transaction; (6) refused to transfer the cash necessary to pay SeaQuest's monthly overhead, and instead paid some, but not all, of SeaQuest's expenses directly from S&J's operating account; (7) converted $484,000 from SeaQuest's bank account; (8) secretly transferred $250,000 to Jones's father; (9) overestimated the value of a piece of equipment by $350,000; and (10) unreasonably demanded that SeaQuest pay $300,000 to S&J's financial advisor to complete the buyout transaction.

On October 3, 2006, the parties dictated a second Rule 11 agreement into

the trial court record (October 3 Settlement Agreement). The October 3 Settlement Agreement provided, in relevant part, that (1) S&J would no longer be a member of SeaQuest LLC, and S&J would no longer be a limited partner of SeaQuest LP; (2) "the asset contribution and transaction agreement [ACTA] will be rescinded such that Sea[Q]uest and S&J Diving will retain all of its [contributed] assets"; (3) the parties would enter into an "asset sales agreement" where S&J would sell some of its formerly contributed assets to SeaQuest for $3,100,000; (4) SeaQuest would reimburse S&J for overhead expenditures made on behalf of SeaQuest since June 1, 2006 in the amount of $2,300,000;[1] and (5) SeaQuest would pay S&J "an amount that is the equivalent of what would have been called priority return under the partnership agreement had S&J not rescinded its partnership interest in that entity."[2] The parties agreed that if there was any dispute regarding the October 3 Settlement Agreement, the state district court judge presiding over the second lawsuit would be the sole and final arbiter, thereby effectively waiving jury trial and appeal.

The transaction contemplated by the October 3 Settlement Agreement never occurred. On January 5, 2007, S&J filed a counterclaim against SeaQuest seeking enforcement of the October 3 Settlement Agreement. S&J alleged that SeaQuest was in breach of contract by failing to (1) close the transaction, (2) purchase S&J's assets for $3,100,000, (3) reimburse expenses in the amount of $2,300,000, and (4) pay S&J a priority return in the amount of $399,845. In its prayer, S&J sought appointment of a receiver, return of its contributed assets,

---

[1] Because S&J contributed substantially all of SeaQuest's capital, SeaQuest presumably would be forced to finance this $5,400,000 transaction through borrowing from third-party lenders or additional capital contributions from the remaining limited partners.

[2] Priority return was defined in the LP Agreement as approximately 10% per annum of the average daily balance of S&J's capital contributions to the limited partnership.

enforcement of the one-year non-compete agreement in the October 3 Settlement Agreement, actual damages, and attorney's fees.

The state court entered judgment on March 23, 2007 in favor of S&J. The state court awarded S&J $2,604,000 in actual damages, $128,014 in attorney's fees, and $10,000 in "organizational fees." These damage awards totaled $2,742,014. The state court appointed a receiver and ordered SeaQuest to return S&J's contributed assets, but it declined to enforce the one-year non-compete agreement. Six days later, SeaQuest filed for bankruptcy on March 29, 2007.

## B.    The Bankruptcy Court's Decision

Schedule F listed S&J as an unsecured creditor of the bankruptcy estate in the amount of $2,742,014 (S&J claim). The S&J claim was based on the state court judgment. On June 28, 2007, the debtors and two of their creditors, Emmons & Jackson, PC (E&J) and Ryan Marine Services (Ryan Marine), filed an adversary proceeding seeking to subordinate the S&J claim pursuant to 11 U.S.C. § 510(b). On January 23, 2008, the bankruptcy court agreed that the S&J claim should be subordinated and granted summary judgment in favor of SeaQuest.

The bankruptcy court concluded the following: (1) the S&J claim is a right to payment adjudicated by the state court judgment; (2) the state court judgment is an adjudication of rescission of the LP and LLC agreements and related obligations to merge businesses and acquire securities; (3) because the state court judgment and the claim it adjudicates arose from the rescission of these securities transactions, § 510(b) applies; (4) the rescission is not the equivalent of a redemption of stock by SeaQuest; and (5) the S&J claim must be subordinated pursuant to the plain language of § 510(b).

S&J appealed the order of the bankruptcy court, and the district court certified the bankruptcy court's order for direct appeal to the Fifth Circuit. *See*

28 U.S.C. § 158(d); FED. R. BANKR. P. 8001(f). The Fifth Circuit granted the petition for leave to appeal under 28 U.S.C. § 158(d). *See In re OCA, Inc.*, 552 F.3d 413, 418 (5th Cir. 2008).

## II. Analysis

### A. Standard of Review

"When directly reviewing an order of the bankruptcy court, we apply the same standard of review that would have been used by the district court." *Drive Fin. Servs., L.P. v. Jordan*, 521 F.3d 343, 346 (5th Cir. 2008). A grant of summary judgment is reviewed de novo. *In re Erlewine*, 349 F.3d 205, 209 (5th Cir. 2003). Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); FED. R. BANKR. P. 7056 (applying FED. R. CIV. P. 56 to adversary bankruptcy proceedings).

### B. Mandatory Subordination under 11 U.S.C. § 510(b)

Subordination alters the otherwise applicable priority of a claim under the bankruptcy code. Section § 510(b) of the bankruptcy code states the following:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

"Section 510(b) serves to effectuate one of the general principles of corporate and bankruptcy law: that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets." *In re Am. Wagering, Inc.*, 493 F.3d 1067, 1071 (9th Cir. 2007). The issue in this case is whether the S&J claim qualifies as "a claim arising from rescission of a purchase or sale of a security of the

debtor." If so, subordination is mandatory under § 510(b). *See Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 528 (5th Cir. 2004); *In re Basin Res. Corp.*, 190 B.R. 824, 826 (Bankr. N.D. Tex. 1996).

S&J received all of the Class A shares in SeaQuest LP in exchange for significant capital contributions of assets and cash, and Jones received a 25% membership interest in SeaQuest LLC in exchange for $250. The October 3 Settlement Agreement rescinded the purchase of the LP and LLC interests and required SeaQuest to (1) return S&J's contributed assets; (2) purchase some of those assets for $3,100,000,[3] (3) reimburse $2,300,000 in overhead expenses paid by S&J since June 1, 2006,[4] and (4) pay the "priority return" under the LP Agreement. SeaQuest breached this agreement, and S&J obtained a state court judgment against SeaQuest for breach of contract in the amount of $2,742,014.

Assuming § 510(b) applies, the S&J claim must be subordinated to all claims that are senior to or equal S&J's Class A limited partnership interest in SeaQuest. Because unsecured creditors like E&J and Ryan Marine have a higher priority than Class A shareholders like S&J, § 510(b) would prevent S&J from relying on the state court judgment to elevate the priority of the S&J claim from Class A equity to unsecured debt.

---

[3] Apparently, the parties arrived at a buy-out price that was approximately half of the original valuation of the capital contribution because SeaQuest (1) did not buy all the assets that were originally contributed and (2) reduced the valuation of certain assets.

[4] Because SeaQuest received all of its capital from S&J, it relied on S&J to pay all of its daily operating expenses after it was created on June 1. Although S&J was obligated to transfer its cash and accounts receivable to SeaQuest pursuant to the ACTA, it appears that Jones never relinquished authority over these accounts, so SeaQuest relied on Jones to pay its expenses incurred after June 1 from S&J's operating accounts. During negotiations after the October 3 Settlement Agreement, S&J sent SeaQuest a sales price proposal that categorized the $2,300,000 in overhead expenses as "Capital Contributions after 6/1."

## C.  Plain Language

SeaQuest argues that the S&J claim is subject to mandatory subordination under the plain language of § 510(b). "The starting point in discerning congressional intent is the existing statutory text." *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004). "[W]hen the statute's language is plain, the sole function of the courts—as least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Id.* A court should only turn to legislative history if the statute is ambiguous. *In re Rogers*, 513 F.3d 212, 225-26 (5th Cir. 2008).

Section 510(b) states that "a claim arising from the rescission of a purchase or sale of a security of the debtor . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security . . . ." A "claim" includes a state court judgment. *See* 11 U.S.C. § 101(5)(A). S&J's LP interest qualifies as a "security" for purposes of § 510(b), *see* 11 U.S.C. § 101(49)(A)(xiii), and Jones's LLC interest either qualifies as a "transferable share" or falls within the broad residual category. *Id.* § 101(49)(A)(viii), (xiv); *see also In re Alta+Cast, LLC*, 301 B.R. 150, 154-55 (Bankr. D. Del. 2003) (holding that a claim based on the debtor's failure to purchase claimant's LLC membership interest was subject to mandatory subordination).

The only remaining issue is whether the S&J claim "arises from" the rescission of a purchase or sale of a security of SeaQuest. Although the October 3 Settlement Agreement resulted in a rescission of S&J's equity investment by mutual agreement of the parties, the plain language of § 510(b) does not distinguish between rescission by the court and rescission by the parties. S&J argues that its claim "arises from" the state court judgment, not the rescission. S&J characterizes itself as an unsecured creditor who obtained a pre-petition

judgment on a breach of contract claim. According to S&J, we cannot look behind the state court judgment to determine whether the S&J claim "arises from" a rescission. After observing that it was not an equity investor at the time SeaQuest filed for bankruptcy, S&J argues that "the equitable nature of a claim is lost once it is converted to a promissory note or judgment." In order to address this ambiguity regarding the scope of § 510(b), we must look past the plain language and examine the prior application, legislative history, and policy of the statute.

## D.    Rescission Claims

Section 510(b) requires the subordination of three distinct categories of claims: (1) a claim arising from rescission of a purchase or sale of a security of the debtor (the rescission category); (2) a claim for damages arising from the purchase or sale of a security of the debtor (the damages category); and (3) a claim for reimbursement or contribution allowed under 11 U.S.C. § 502 on account of either (1) or (2). *See In re Geneva Steel Co.*, 281 F.3d 1173, 1177 (10th Cir. 2002). Only the first two categories are relevant to this case.

Congress anticipated that claims falling within the rescission category would typically involve claimants who seek rescission by the court as a remedy for securities fraud. *See, e.g., In re Wyeth Co.*, 134 B.R. 920, 921 (Bankr. W.D. Mo. 1991) ("[Congress's] concern was that an equity holder could elevate his claim to that of an unsecured creditor through a claim for rescission of his purchase of the debtor's securities or a tort claim for damages arising out of his purchase of the debtor's securities."). When it enacted § 510(b), Congress was primarily focused on rescission claims based on fraud in the issuance of securities. *See id.* at 921-22 ("But subordination of rescission or tort damage claims arising out of an illegal stock transaction keeps the risk where it belongs, i.e., upon the shoulders of the equity purchaser."); *see also In re Granite*

-10-

*Partners, L.P.*, 208 B.R. 332, 339 (Bankr. S.D.N.Y. 1997). In this case, we must determine whether § 510(b) applies when a contract is rescinded based upon the mutual agreement of the parties rather than as a court-imposed remedy for securities fraud.

For purposes of § 510(b), "rescission" is not defined in the bankruptcy code. Black's Law Dictionary defines the term as "[a] party's unilateral unmaking of a contract for a legally sufficient reason, such as the other party's material breach, or a judgment rescinding the contract; voidance." BLACK'S LAW DICTIONARY 1332 (8th ed. 2004). It defines "legal rescission" as "[r]escission that is effected by the agreement of the parties." *Id.* The plain language of § 510(b) does not distinguish between equitable rescission by a court as a remedy for securities fraud and legal rescission by the parties as a remedy for irreconcilable differences.

Because the breach of contract claim underlying the state court judgment is based upon Texas law, we will examine how Texas courts have defined rescission. "As a general rule, rescission puts an end to a contract." *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 855 (Tex. App.—Houston [14th Dist.] 2001, pet. denied); *see also 9029 Gateway S. Joint Venture v. Eller Media Co.*, 159 S.W.3d 183, 186 (Tex. App.—El Paso 2004, no pet.) ("[R]escission is a general undoing of an agreement . . . ."). "Rescission is an equitable remedy and, as a general rule, the measure of damage is the return of the consideration paid, together with such further special damage or expense as may have been reasonably incurred by the party wronged on account of the contract." *Smith v. Nat'l Resort Cmtys., Inc.*, 585 S.W.2d 655, 660 (Tex. 1979).

Contracting parties may voluntarily agree to enter into a rescission agreement whereby "each party agrees to discharge all of the other party's remaining duties of performance under an existing contract." *Am. Heritage, Inc.*

-11-

*v. Nev. Gold & Casino, Inc.*, 259 S.W.3d 816, 822 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 283(1) (1981)); *see also Sid Richardson Carbon & Gasoline Co. v. Interenergy Res., Ltd.*, 99 F.3d 746, 754 (5th Cir. 1996) ("Under Texas law, parties may mutually agree to 'rescind' a contract, restoring the *status quo ante*."). "The mutual release of the rights of the parties is regarded as a sufficient consideration for the agreement." *Tex. Gas Utils. Co. v. Barrett*, 460 S.W.2d 409, 414 (Tex. 1970). The purpose of rescission is to place the parties in the position that they would have occupied if no such contract had ever been made. *Baty*, 63 S.W.3d at 855.

The October 3 Settlement Agreement rescinded the ACTA and required SeaQuest to return S&J's equipment, refund certain overhead expenses, and pay the priority return. The state court judgment acknowledged this fact by ordering that SeaQuest return all of S&J's contributed assets within fourteen days. Because it ordered the return of these assets, the state court refused to award S&J the $3,100,000 that SeaQuest agreed to pay for these assets. The bulk of the $2,742,014 damages award represents the overhead expenses that S&J paid on SeaQuest's behalf after June 1, 2006, which were considered capital contributions under the LP Agreement.

The rescission in this case is similar to the rescission in *Smith*. In *Smith*, the plaintiff sought the rescission of a real estate contract after learning that the land was encumbered by an inundation easement and not suitable for residential use. 585 S.W.2d at 656. The court ordered that the defendants refund the purchase price and that the plaintiffs return the property to the defendants. *Id.* at 659-60. In this case, S&J and SeaQuest sought to "undo" S&J's investment in SeaQuest by seeking the return of its contributed assets and cash.

We find that the October 3 Settlement Agreement resulted in a rescission of the LP and LLC agreements under Texas law. Because SeaQuest has not

-12-

identified any cases under § 510(b) that subordinate claims arising from post-issuance rescission of a contract by mutual agreement of the parties, we will look to cases involving the damages category for guidance.

## E.    Damages Claims

"Any discussion of section 510(b) must begin with the 1973 law review article authored by Professors John J. Slain and Homer Kripke, entitled *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261 (1973)." *Granite Partners*, 208 B.R. at 336. Congress relied heavily on the Slain and Kripke article when drafting § 510(b). *See In re Betacom of Phoenix, Inc.*, 240 F.3d 823, 829 (9th Cir. 2001). "Effective November 1978, the Bankruptcy Reform Act inserted the subordination principle first articulated by Slain and Kripke into bankruptcy law" through the enactment of § 510(b). *Geneva Steel*, 281 F.3d at 1177.

The subordination thesis in the Slain and Kripke article was premised upon the allocation of certain risks between investors and creditors. *See Granite Partners*, 208 B.R. at 336. "[B]oth investors and creditors accept the risk of enterprise insolvency," but to differing degrees, as reflected in the absolute priority rule.[5] *Id.* While the creditor anticipates repayment of a fixed debt, the investor anticipates a potentially unlimited share of future profits. *Id.* In exchange for this "unique right to participate in the profits," the investor risks the loss of his capital investment, which provides an "equity cushion" for the repayment of creditors' claims. *Id.* "In contrast, investors alone bear the risk

---

[5] "The absolute priority rule requires that certain classes of claimants be paid in full before any member of a subordinate class is paid. Under this rule, unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated." *Geneva Steel*, 281 F.3d at 1180 n.4; *see also In re Babcock & Wilcox Co.*, 250 F.3d 955, 959-60 (5th Cir. 2001).

of illegality in the issuance of securities" because it would be improper to reallocate this risk to creditors who (1) never bargained for an equity position in the debtor and (2) extended credit to the debtor in reliance on the equity cushion provided by the investors. *Id.*

Notwithstanding this emphasis in the legislative history on rescission and damages claims arising from securities fraud, the Ninth Circuit concluded that "[t]here is nothing in the Slain and Kripke analysis to suggest that Congress's concern with creditor expectations and equitable risk allocation was limited to cases of debtor fraud." *Betacom,* 240 F.3d at 829. Rather, Congress's larger concern was the effort of disaffected stockholders to recapture their investments from the debtors, regardless of the exact nature of their claims. *See Granite Partners*, 208 B.R. at 337.

In *Betacom*, the Ninth Circuit rejected the plaintiffs' argument that § 510(b) only applies to securities fraud claims. *See* 240 F.3d at 828-29. The court ultimately held that a claim arising from the debtor's failure to deliver stock pursuant to a merger agreement was subject to mandatory subordination. *See id.* at 831-32. By bargaining with the debtor to receive equity instead of debt, the plaintiffs entered the transaction with greater financial expectations than a creditor, *see id.* at 830, and the unsecured creditors presumably relied on the plaintiffs' contribution to the equity pool when extending credit to the debtor. *See id.* at 830-31.

The Second, Third, and Tenth Circuits have adopted the broad reading of the damages category adopted by the Ninth Circuit in *Betacom*. The Third Circuit has held that a claim arising from breach of a provision in a stock purchase agreement requiring the issuer to use its best efforts to register stock and ensure that it is freely tradable was subject to mandatory subordination. *See In re Telegroup, Inc.*, 281 F.3d 133, 136, 141-42 (3d Cir. 2002). The Tenth

-14-

Circuit has held that a claim arising from post-issuance fraud of the debtor, which caused an investor to hold rather than sell his securities, was subject to mandatory subordination.[6] *See Geneva Steel*, 281 F.3d at 1180-81.  The Second Circuit has held that a claim arising from breach of a stock exchange provision in a termination agreement was subject to mandatory subordination.  *See In re Med Diversified, Inc.*, 461 F.3d 251, 256 (2d Cir. 2006).  Unlike this case, these circuit court cases involve stockholder claims arising from failure to deliver stock (*Betacom*), failure to register stock (*Telegroup*), failure to exchange stock (*Med Diversified*), and fraudulent inducement to retain stock (*Geneva Steel*).  They are relevant, however, to the extent they clarify the scope and policy of § 510(b).

For purposes of the damages category, the circuit courts agree that a claim arising from the purchase or sale of a security can include a claim predicated on post-issuance conduct, such as breach of contract.  *See Telegroup*, 281 F.3d at 140, 142.  They also agree that the term "arising from" is ambiguous, so resort to the legislative history is necessary.  *See id.* at 138; *Geneva Steel*, 281 F.3d at 1178; *Med Diversified*, 461 F.3d at 255.  For a claim to "arise from" the purchase or sale of a security, there must be some nexus or causal relationship between the claim and the sale.  *See Telegroup*, 281 F.3d at 138.  Further, the fact that the claims in the case seek to recover a portion of claimants' equity investment is the most important policy rationale.  *See id.* at 142; *Geneva Steel*, 281 F.3d at 1179.  "When an investor seeks *pari passu* treatment with the other creditors,

___

[6]  Following the lead of the Tenth Circuit, the bankruptcy courts have subordinated "fraudulent inducement" and "fraudulent retention" claims related to stock options and common stock.  *See In re Enron Corp.*, 341 B.R. 141, 150-51 (Bankr. S.D.N.Y. 2006) (claims based on pre-issuance fraud, which induced employees to accept stock options as part of their compensation package, and claims based on post-issuance fraud, which caused employees to not exercise certain stock options during their employment, were subject to mandatory subordination); *In re WorldCom, Inc.*, 329 B.R. 10, 14 (Bankr. S.D.N.Y. 2005) (same).

he disregards the absolute priority rule, and attempts to establish a contrary principle that threatens to swallow up this fundamental rule of bankruptcy law." *Granite Partners*, 208 B.R. at 344. When a claimant elects to take an equity stake in the debtor, he becomes bound by the choice to trade the relative safety of a fixed return for the "upside potential of shareholder status." *Med Diversified*, 461 F.3d at 256.

Based on this authority, we find that the rescission category also extends to claims arising from post-issuance conduct. The scope of the rescission and damages categories should be construed consistently. Slain and Kripke's two policy rationales for mandatory subordination apply equally to rescission claims arising from securities fraud and rescission claims arising from the mutual agreement of the parties. *See id.* In both situations, (1) the investors initially bargained for the risk and return expectations of investors, but later changed their minds due to unforseen future events; (2) the unsecured creditors presumably relied on the investors' contributions to the "equity cushion"; and (3) disaffected investors are attempting to share the assets of the bankruptcy estate *pari passu* with unsecured creditors who never bargained for an equity stake in the debtor.

The rescission of the purchase of the LP and LLC interests in SeaQuest was not predicated on securities fraud, but rather on the post-issuance conduct of the parties. The state court judgment "arises from" the rescission of a purchase or sale of those securities because there was a nexus or causal relationship between the state court judgment and the rescission of the purchase of the LP and LLC interests. Subordinating the S&J claim would further the policies of § 510(b) because (1) by structuring the original June 1 transaction as an equity investment rather than a loan, S&J assumed the risk of SeaQuest's future insolvency; (2) the unsecured creditors presumably relied on the equity

cushion originally provided by S&J when extending credit to SeaQuest; and (3) S&J should not be allowed to rescind its equity stake in the debtors and elevate its claim in derogation of the absolute priority rule. *See Am. Wagering*, 493 F.3d at 1072. Although S&J was not a limited partner at the time of SeaQuest's bankruptcy, the circuit courts agree that "a claimant need not be an actual shareholder for his claim to be covered by [§ 510(b)]." *Med Diversified*, 461 F.3d at 258.

## F.    Redemption Claims

Assuming that the rescission category is not limited to claims based on securities fraud, S&J argues that its claim is not subject to mandatory subordination under § 510(b) because its equity stake in SeaQuest was converted into a judgement before SeaQuest filed for bankruptcy. Although various circuit courts have expanded the scope of § 510(b) beyond the securities fraud context, they have done so in cases where the claimants actually held stock or were promised stock in the debtors at the time of the bankruptcy. *Cf. Am. Wagering*, 493 F.3d at 1073 (holding that a claim based on a pre-petition judgment was not subject to mandatory subordination under § 510(b) because the claimant never held, sought, or was promised equity in the debtor).

The policy rationales underlying § 510(b) support the result in the circuit court cases because those claimants bargained for an equity position in the debtors and never converted that equity into debt pre-petition. A claimant who held equity on the petition date or was promised equity has assumed the risk of enterprise insolvency in exchange for the upside potential of equity ownership. By redeeming equity for debt before the bankruptcy filing, the claimant can convert from the "risk/return position of an equity investor" to a "fixed, pre-petition debt due and owing" the claimant as a creditor. *See id.*

In two different cases, the bankruptcy court in the District of Delaware

-17-

held that a claim based on an promissory note issued by a debtor to repurchase its own stock was not subject to mandatory subordination. *See In re Montgomery Ward Holding Corp.*, 272 B.R. 836, 844-45 (Bankr. D. Del. 2001), *abrogated on other grounds by Telegroup*, 281 F.3d at 142; *In re Mobile Tool Int'l, Inc.*, 306 B.R. 778, 782 (Bankr. D. Del. 2004). In *Mobile Tool*, the bankruptcy court stated that when investors exchanged the debtor's stock for a promissory note, "they removed the variable nature of their investment and placed themselves in the position of general creditors." 306 B.R. at 782. Similarly, the bankruptcy court in the Southern District of New York held that a claim based on promissory notes issued in exchange for convertible preferred stock was not subject to mandatory subordination. *In re Marketxt Holdings Corp.*, 361 B.R. 369, 388-90 (Bankr. S.D.N.Y. 2007).

Relying on *Mobile Tool*, a district court held that a claim based on the debtor's breach of an agreement to purchase the claimant's LLC membership interest was not subject to mandatory subordination because the claim was converted to a debt obligation when the claimant obtained a pre-petition judgment against the debtor. *See In re Cybersight LLC*, No. 02-11033, Civ. A. 04-112 JJF, 2004 WL 2713098, at *4 (D. Del. Nov. 17, 2004). In *Cybersight*, the district court found that there was "no material difference between the exchange of a promissory note for equity interest" and the judgment that the claimant received. *Id*. "In both instances, the claimants, pre-petition, were no longer able to participate in the benefits and risks associated with being equity holders of the debtors . . . ." *Id*.

S&J argues that its claim is not subject to mandatory subordination because it is a liquidated debt, equivalent to the promissory note in *Mobile Tool* or the pre-petition judgment in *Cybersight*. In *Mobile Tool*, the claimant tendered his common stock to the debtor in exchange for a promissory note. S&J

argues that it tendered its LP and LLC interests in exchange for assets and cash; therefore, the S&J claim is not subject to mandatory subordination because it arose from a redemption rather than a rescission. Through this redemption, S&J's status changed from an equity investor to an unsecured creditor. In response, SeaQuest argues that S&J's argument is foreclosed by our pre-bankruptcy code case of *Robinson v. Wangemann*, 75 F.2d 756, 758 (5th Cir. 1935).[7] We need not decide whether *Robinson* is relevant to § 510(b) or compatible with the redemption line of cases because the pre-petition judgment in this case did not arise from a redemption of stock.

## G.    Looking Behind the Judgment

For purposes of § 510(b), we may "look behind" the state court judgment to determine whether the S&J claim "arises from" the rescission of a purchase or sale of a security of SeaQuest. *See In re U.S. Wireless Corp., Inc.*, 384 B.R. 713, 720-23 (Bankr. D. Del. 2008). The Supreme Court has approved of this practice when construing other provisions of the bankruptcy code. *See Archer v. Warner*, 538 U.S. 314, 323 (2003); *Brown v. Felsen*, 442 U.S. 127, 138-39 (1979). We reject S&J's argument that "the equitable nature of a claim is lost once it is converted to a . . . judgment." If the court could not look behind the judgment, then subordination of a rescission or tort claim based on securities fraud (which clearly falls within the purview of § 510(b)) would depend upon whether the claimant obtained a pre-petition judgment on the claim. We doubt that Congress intended such a result, which is contrary to the text and

---

[7] In *Robinson*, we held that a claim based on a promissory note issued by the debtor in redemption of its stock should be subordinated to the claims of other unsecured creditors. 75 F.2d at 758. The Seventh Circuit has classified *Robinson* as an equitable subordination case. *In re Envirodyne Indus., Inc.*, 79 F.3d 579, 582 (7th Cir. 1996); *see also* 11 U.S.C. § 510(c) (permitting equitable subordination of claims). We express no opinion on the matter.

legislative history of the statute.  For purposes of § 510(b), a "claim" includes a judgment.  *See* 11 U.S.C. § 101(5).  The fact that a claim has been reduced to a judgment does not deprive the court of the ability to look behind that judgment to determine whether it "arises from" a rescission of a security of the debtor.[8]

The pre-petition judgment in this case was based on breach of the October 3 Settlement Agreement.  This agreement stated that "the asset contribution and transaction agreement [ACTA] will be rescinded such that Sea[Q]uest and S&J Diving will retain all of its [contributed] assets," S&J will no longer be a limited partner of SeaQuest LP, and Jones will no longer be a member of SeaQuest LLC.  The $3,100,000 "asset sales agreement," which was never consummated, was dependent upon the return of these contributed assets, and the payment of $2,300,000 in overhead expenses was characterized as a "reimbursement" of S&J's capital contribution.  By structuring the transaction as a rescission rather than a redemption, S&J immediately realized the benefit of recouping a significant portion of its capital contribution rather than sharing those assets *pari passu* with other unsecured creditors during SeaQuest's bankruptcy.

If the transaction was structured as a redemption similar to the one in *Montgomery Ward* or *Mobile Tool*, then SeaQuest would have retained all of the capital contributions and issued a promissory note to S&J for the total value of its equity stake.  If SeaQuest filed for bankruptcy before (1) satisfying its

---

[8] S&J ignores the facts of *Montgomery Ward* and *Mobile Tool* when it advocates a bright-line rule that all claims based on a contractual debt or promissory note fall outside the scope of § 510(b).  Those two cases involve the redemption of stock in exchange for a promissory note issued by the debtor.  Assuming *arguendo* that they were correctly decided, they are not relevant to this case unless the S&J claim actually arises from a redemption of S&J's equity stake in SeaQuest.  In this case, the state court judgment was based upon breach of the October 3 Settlement Agreement, but SeaQuest's debt obligations under that contract arise from the rescission of S&J's equity stake in the debtor.

payment obligations under the note or (2) satisfying a pre-petition judgment based upon its default, then the claims of all unsecured creditors (including S&J) would be satisfied from the "equity cushion" provided by S&J's capital contributions. We construe this transaction as a rescission rather than a redemption because SeaQuest "redeemed" S&J's equity stake with the same assets that S&J used to purchase it. S&J did not seek redemption of its equity stake in SeaQuest; rather, it sought rescission of the ACTA and LP agreement and return of its capital contributions. *See Smith*, 585 S.W.2d at 660.

Under Texas law, a party to a rescinded contract may obtain special damage or expense reasonably incurred in addition to the return of the consideration paid. *See id.* "[I]f damages as well as rescission are essential to accomplish full justice, they will both be allowed." *Id.* Although SeaQuest's obligation to pay S&J the "priority return" under the LP Agreement does not constitute a "return of the consideration paid," this relatively small benefit-of-the-bargain component of the October 3 Settlement Agreement does not convert the transaction into a redemption rather than a rescission. Because the priority return was essentially interest on S&J's capital contribution, its inclusion in the October 3 Settlement Agreement was a permissible attempt to return the parties to the status quo ante. *See id.* (holding that an award of interest on restitutionary damages arising from rescission of a contract can be a proper component of recovery).

The primary purpose of the October 3 Settlement Agreement was to rescind S&J's equity investment in SeaQuest. All of SeaQuest's financial obligations under that agreement arose from this rescission, including its obligation to pay S&J the priority return. Because rescission by the parties is inherently more flexible than rescission by the court, the nature of the ancillary remedies chosen by the parties does not control whether the transaction is a

"rescission" for purposes of § 510(b). Rather, the court must look behind the judgment and examine the totality of the circumstances to determine whether the transaction is a "rescission of a purchase or sale of a security of a debtor." This analysis should be informed by the policy rationales underlying § 510(b).

By executing the October 3 Settlement Agreement, S&J was attempting to rescind the ACTA and LP Agreement and claw back its capital contributions. SeaQuest's promise to return the contributed assets, reimburse the overhead expenses, and pay the priority return arose from the rescission of the ACTA and LP Agreement. S&J wants to have it both ways. It wants to exclusively retain the benefits arising from rescission of the ACTA (returned assets) while treating the deficiency (overhead expenses and the priority return) as a fixed debt obligation arising from a "redemption" of its equity stake. S&J recovered the entirety of the asset component of its equity investment through rescission, and it now seeks to share the cash component of its equity investment *pari passu* with the unsecured creditors through characterizing its claim as a redemption. In violation of the absolute priority rule, this investor wants to be treated as a secured creditor with respect to its contributed assets and an unsecured creditor with respect to its contributed cash. This maneuver would shield the bulk of S&J's equity investment from the unsecured creditors who presumably relied upon it when extending credit to SeaQuest.

The S&J claim is the unpaid damages arising from rescission of the LP and LLC interests. Now that SeaQuest is in bankruptcy, the S&J claim, which represents the capital contributions of a former investor, must be subordinated to the claims of the unsecured creditors who never bargained for an equity stake in the debtor. S&J correctly observes that it was owed a debt under the October 3 Settlement Agreement, but that debt would not exist but for the rescission of its equity investment in SeaQuest. Based on the facts of this case, subordinating

-22-

the S&J claim is consistent with the primary policy rationale underlying §
510(b).  *See Telegroup,* 281 F.3d at 142.

## III.  Conclusion

The bankruptcy court correctly held that the S&J claim was subject to
mandatory subordination under § 510(b).  As an alternative to reversal, S&J
requests that we remand the case to the bankruptcy court because genuine
issues of material fact exist regarding the nature of the October 3 Settlement
Agreement and the composition of the damages award.  Before the bankruptcy
court, S&J stipulated that there were no genuine issues of material fact, so this
argument is waived.  *See Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004).
Assuming that the argument was merely forfeited, we find no plain error.  *See
Crawford v. Falcon Drilling Co.*, 131 F.3d 1120, 1123 (5th Cir. 1997) (applying
the plain-error standard of review to unpreserved error in a civil case).

AFFIRMED.