# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 18-40369

————

United States Court of Appeals
Fifth Circuit

**FILED**

September 3, 2019

Lyle W. Cayce
Clerk

In the Matter of:  LINN ENERGY, L.L.C.; BERRY PETROLEUM COMPANY, L.L.C.; LINNCO, L.L.C.; LINN ACQUISITION COMPANY, L.L.C.; LINN ENERGY FINANCE CORPORATION; LINN EXPLORATION ; PRODUCTION MICHIGAN, L.L.C.; LINN EXPLORATION MIDCONTINENT, L.L.C.; LINN MIDSTREAM, L.L.C.; LINN MIDWEST ENERGY, L.L.C.; LINN OPERATING, INCORPORATED; MID-CONTINENT I, L.L.C.; MID-CONTINENT II, L.L.C.; MID-CONTINENT HOLDINGS II, L.L.C.,

Debtors

DANA FRENCH, personal representative of the Estate of Clarence J. "Peter" Bennett,

Appellant

v.

LINN ENERGY, L.L.C.; BERRY PETROLEUM COMPANY, L.L.C.; LINNCO, L.L.C.,

Appellees

Consolidated With 18-40731

In the Matter of:  LINN ENERGY, L.L.C.; BERRY PETROLEUM COMPANY, L.L.C.; LINNCO, L.L.C.; LINN ACQUISITION COMPANY, L.L.C.; LINN ENERGY FINANCES CORPORATION; LINN EXPLORATION ; PRODUCTION MICHIGAN, L.L.C.; LINN EXPLORATION MIDCONTINENT, L.L.C.; LINN MIDSTREAM, L.L.C.; LINN MIDWEST ENERGY, L.L.C.; LINN OPERATING INCORPORATED; MID-CONTINENT I, L.L.C.; MID-CONTINENT II, L.L.C.; MID-CONTINENT HOLDINGS II, L.L.C.,

Debtors

No. 18-40369 c/w 18-40731

BRUCE D. BICKEL, personal representative of the Estate of Clarence J. "Peter" Bennett,

      Appellant

v.

LINN ENERGY, L.L.C.; BERRY PETROLEUM COMPANY, L.L.C.; LINNCO, L.L.C.,

      Appellees

————————————

Appeals from the United States District Court
for the Southern District of Texas

————————————

Before CLEMENT, HAYNES, and WILLETT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

In this case we decide that payments owed to a shareholder by a bankrupt debtor, which are not quite dividends but which certainly look a lot like dividends, should be treated like the equity interests of a shareholder and subordinated to claims by creditors of the debtor. We therefore affirm.

## I.

Clarence Bennett had a wealthy uncle. In 1930, that uncle died. His will created a trust for the benefit of certain relatives, including Bennett. The will placed 250 shares of the uncle's company, Berry Holding Company ("BHC"), into the trust and divided the trust beneficiaries into classes. The first class was "A Group." Its members would share 37.5% of the income earned on the 250 shares for so long as any of them were alive. The second class, which included Bennett, was "B Group." Just like A Group, its members would share 37.5% of the income earned on the trust for so long as any B Group members

were alive. The trust provided that upon the death of any member of A Group or B Group, his share would be divided equally among the surviving members of his group.

The remaining 25% of trust income was to be held in trust until the third class, "C Group," of which Bennett was also a member, came of age. The C Group members were children at the time. The trust provided that when the youngest of them turned 21, the C Group members would receive the income on the 25% which had been held in trust up to that point, and the trust corpus would be distributed amongst the C Group members.

In 1949, the youngest member of C Group came of age. In a court-approved agreement, the 250 shares of BHC were divided among the eight C Group members so that each received 31.5 shares. Further, to facilitate the continuing distributions of income to A Group and B Group members, the agreement provided that BHC would place all the income on the 250 shares of BHC stock into the C.J. Berry Trust Beneficiaries Distribution Account. BHC would then distribute the income to the classes from the account as required by the trust. In other words, 37.5% of the income in the account would go to A Group, 37.5% would go to B Group, and the C Group members would each receive the remaining income earned on their 31.5 shares. Because the BHC shares were now owned by the eight C Group members, an equitable charge was placed on the shares for the value of the distributions to the A Group and B Group members. An "equitable charge" is a type of security interest which allows a creditor to sue for recovery of the property on which the charge is placed if the debtor defaults. *Equitable Charge,* BLACK'S LAW DICTIONARY (11th ed. 2019). By virtue of his B Group membership, Bennett maintained an interest in 37.5% of the income paid as dividends on the 250 shares. And by virtue of his C Group membership, Bennett owned 31.5 shares of BHC stock outright.

No. 18-40369 c/w 18-40731

From 1949 to 1986, Bennett received regular income payments on BHC stock dividends. Then, in 1986, BHC underwent a merger and became Berry Petroleum Company ("BPC"), a publicly traded company. An unrelated dispute arose between BPC and a third party, Victory Holding Company ("VHC"). To settle the dispute, BPC agreed to retire VHC's shares—i.e., buy VHC out. But there was a problem: the proposed retirement would injure B Group. VHC owned approximately 950,000 shares of BPC stock that were subject to B Group's 37.5% equitable charge. If the VHC shares were retired, it would mean that no dividends would be paid on those shares. Since B Group's then-living members were entitled to 37.5% of any dividends issued to VHC, they would be harmed by the retirement.

To appease the B Group members (only three were still alive at this point), BPC created the "Victory Trust." BPC would act as the trustee of the Victory Trust. The trust provided that the VHC shares would be retired by BPC; however, BPC would continue to pay B Group members in an amount equal to 37.5% of the dividends that VHC would have received if its shares had not been retired. Those payments were not actually dividends (since no dividends were issued to VHC anymore), but rather "deemed dividends," akin to settlement payments whose amount was tethered to the value of BPC distributions. Each time BPC paid dividends to its shareholders, BPC calculated the dividends that VHC would have received and then paid Bennett and the other two survivors 37.5% of that amount from the money BPC kept in the Victory Trust.

The system worked. From 1986 to 2013, BPC paid B Group members as required by the Victory Trust. Note that the trust only required BPC to pay the B Group members income when dividends were issued; the trust did not require BPC to issue dividends in the first place. So while B Group members

4

had a right to 37.5% of the income which would have been paid as dividends to VHC, they had no right to any income if dividends were not paid.

By 2013, Bennett was the only surviving member of B Group. He alone received 37.5% of the income paid as dividends on VHC's "shares" of BPC stock. He also received dividends through his own stock ownership in BPC. Then, in 2013, BPC entered into a share-for-share exchange with Linn Energy LLC and LinnCo LLC (collectively, "Linn"). Through the transaction, BPC became Berry Petroleum Company, LLC ("Berry"). To help obtain Bennett's approval of the deal as a stockholder in BPC, Linn purportedly promised to undertake and continue BPC's obligation to pay Bennett, as the last surviving beneficiary of B Group, the deemed dividends. But once the deal was done, the payments stopped coming. For purposes of this appeal, it does not matter whether Linn and BPC acted appropriately in terminating the payments. This appeal assumes the claims against Linn and BPC are valid.

In late 2014, Linn filed suit in the Eastern District of California seeking a declaration that it owed Bennett nothing. Bennett filed a counterclaim in January 2015, then died in June 2015. His estate filed an amended counterclaim against Linn and added Berry as a defendant in December 2015, asserting six causes of action. In addition to breach of contract claims, the Estate advanced tort claims including misrepresentation, elder abuse, and breach of fiduciary duty.

In May 2016, Linn, Berry, and various associated entities filed for bankruptcy in Texas. The Estate filed claims for almost $10 million in unpaid deemed dividends. Linn and Berry (collectively, the "Debtors") filed an objection, arguing that the claims should either be expunged or subordinated under Section 510(b) of the Bankruptcy Code because Bennett had been an investor. The bankruptcy court sustained the Debtors' objections in part and subordinated half of the Estate's claims. Because of the Debtors' limited assets,

No. 18-40369 c/w 18-40731

the subordination order effectively gutted the Estate's chances to receive any money. The bankruptcy court allowed the Estate to amend its complaint to clarify the basis for the misrepresentation and breach of fiduciary duty claims.

The Estate amended its remaining claims before the bankruptcy court, and in the meantime appealed the first subordination order. In April 2018, the district court affirmed that order. The Estate immediately appealed to this court. Following a hearing, the bankruptcy court also subordinated the Estate's remaining claims. The bankruptcy court certified its second subordination order for immediate appeal; we allowed the Estate to skip the district court and consolidated its appeal of the second subordination order with the first appeal.

## II.

"We apply the same standard of review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court." *In re Pratt*, 524 F.3d 580, 584 (5th Cir. 2008); *see also Drive Fin. Servs., L.P. v. Jordan*, 521 F.3d 343, 346 (5th Cir. 2008) ("When directly reviewing an order of the bankruptcy court, we apply the same standard of review that would have been used by the district court."). That means we review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. *In re Am. Hous. Found.*, 785 F.3d 143, 152 (5th Cir. 2015), as revised (June 8, 2015). "Under a clear error standard, this court will reverse only if, on the entire evidence, we are left with the definite and firm conviction that a mistake has been made." *Id.* (quotation omitted). Because it is a matter of statutory interpretation, a bankruptcy court's Section 510(b) determination is a legal conclusion this court reviews de novo. *See In re SeaQuest Diving, LP*, 579 F.3d 411, 417 (5th Cir. 2009) (reviewing Section 510(b) determination at summary-judgment stage de novo); *In re Foust*, 310 F.3d 849, 854 (5th Cir. 2002) (statutory interpretation reviewed de novo).

6

### III.

"Subordination alters the otherwise applicable priority of a claim under the bankruptcy code." *SeaQuest*, 579 F.3d at 417. Section 510(b) of the Bankruptcy Code provides:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b). "Section 510(b) serves to effectuate one of the general principles of corporate and bankruptcy law: that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets." *SeaQuest*, 579 F.3d at 417 (quotation omitted). If a claim falls within Section 510(b), subordination is mandatory. *Id.*

"Any discussion of section 510(b) must begin with the 1973 law review article authored by Professors John J. Slain and Homer Kripke, entitled *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261 (1973)." *Id.* at 420 (quotation omitted); *see also In re Betacom of Phoenix, Inc.*, 240 F.3d 823, 829 (9th Cir. 2001) ("Congress relied heavily on the analysis of two law professors in crafting the statute."). "Effective November 1978, the Bankruptcy Reform Act inserted the subordination principle first articulated by Slain and Kripke into bankruptcy law through the enactment of § 510(b)." *SeaQuest*, 579 F.3d at 420 (quotation omitted). The crux of Slain and Kripke's subordination principle is this:

No. 18-40369 c/w 18-40731

[B]oth investors and creditors accept the risk of enterprise insolvency but to a different degree. This stems from their dissimilar expectations. Even if the business prospers, the creditor anticipates no more than the repayment of his fixed debt. Further, the shareholder's investment provides an equity cushion for the repayment of the claim[, which the creditor relies on in extending credit to the business]. The investors, on the other hand, share the profits to the exclusion of the creditors. The shareholder's enhanced risk of insolvency represents the flipside of his unique right to participate in the profits. The allocation of the risk, as between the investor and the creditor, is reflected in the absolute priority rule,[1] and should not be reallocated.

*In re Granite Partners, L.P.*, 208 B.R. 332, 336 (Bankr. S.D.N.Y. 1997) (citations omitted). Thus the "most important policy rationale behind Section 510(b) is that claims seeking to recover a portion of claimants' equity investments should be subordinated." *Am. Hous. Found.*, 785 F.3d at 153 (cleaned up).

## A.

The policy goals of Section 510(b) are clear, but applying the statute is more complex. Circuit courts agree the "arising from" language is ambiguous. *SeaQuest*, 579 F.3d at 421. The Debtors urge the court to find subordination where: (1) a claim is for "damages," (2) the claim involves "securities," and (3) the claim "arise[s] from" a "purchase or sale" having a nexus with those securities. That approach is consistent with our decision in *In re American Housing Foundation*. 785 F.3d at 153–56. Other courts arrange the elements differently, but the analysis is fundamentally the same. *See, e.g., In re Lehman Bros. Holdings Inc.*, 855 F.3d 459, 472–78 (2d Cir. 2017) (examining (1)

---

[1] "The absolute priority rule requires that certain classes of claimants be paid in full before any member of a subordinate class is paid. Under this rule, unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated." *SeaQuest*, 579 F.3d at 420 n.5 (quotation omitted).

whether the claimant owns a security, (2) whether the claimant acquired the security through a purchase or sale, and (3) whether the claimant's damage claim arose from the purchase or rescission of the security).

The Estate does not challenge the Debtors' organization of the subordination inquiry, and we find that organization useful. In applying it, however, we are mindful that a formulaic check-the-box approach to subordination under the statute is impossible. Given its ambiguity, the policy rationales behind Section 510(b) must always guide its interpretation and application to particular facts. *See Am. Hous. Found.*, 785 F.3d at 154–55 (policy goals of the statute support subordination); *SeaQuest*, 579 F.3d at 421–22 (same); *In re Telegroup, Inc.*, 281 F.3d 133, 141 (3d Cir. 2002) (same). The most important question is this: Does the nature of the Estate's interest make the Estate more like an investor or a creditor? Because we conclude the deemed dividends gave the Estate benefits normally reserved for equity investors, we conclude subordination of all of the Estate's claims was appropriate.

**i.**

The Bankruptcy Code does not define "damages." But "[s]everal bankruptcy courts have reasoned that the concept of damages under Section 510(b) has the connotation of some recovery *other than* the simple recovery of an unpaid debt due upon an instrument." *Am. Hous. Found.*, 785 F.3d at 154 (quotations omitted) (citing *In re Blondheim Real Estate, Inc.*, 91 B.R. 639, 640 (Bankr. D.N.H. 1988) (holding that claim for recovery on debtor's promissory note should not be subordinated under Section 510(b))). Claims seeking compensation for fraud or breach of fiduciary duty are claims for damages and fall within the statute's scope. *Id.* at 153. So do claims "predicated on post-issuance conduct," including claims for breach of contract. *Id.* at 154 (quotation omitted).

No. 18-40369 c/w 18-40731

The Estate does not deny that it is seeking damages, instead arguing that the damages do not arise from the purchase or sale of a security. The lack of engagement on the point is surprising, because a theme throughout the Estate's briefs is that its interest under the trust is more akin to a creditor's contractual right to payment than the equity interest of an investor. One would expect the Estate to argue that its lawsuit seeks only "the simple recovery of an unpaid debt." *Am. Hous. Found.*, 785 F.3d at 154. In any event, all agree the Estate seeks damages within the meaning of the Bankruptcy Code.

**ii.**

The next question is whether the Estate's claims pertain to securities of the debtor. The Estate argues that its interest in receiving dividend payments from BHC, then deemed dividend payments from BPC, does not count as a "security." The Bankruptcy Code contains a long definition of security, but the definition does not refer to equitable charges or payments pursuant to a trust or settlement agreement. The Estate urges that its interest in the deemed dividend payments from BPC does not bear any of the traditional hallmarks of a security interest. Bennett could not sell, bequeath, or otherwise transfer the life interest he obtained in the deemed dividends through his membership in B Group. And Bennett's B Group interest did not convey any voting or shareholder rights to him, was non-negotiable, and did not give him a right to demand dividend payments.

The Debtors respond that Bennett's interest was a security interest because it falls within the residual clause of the Bankruptcy Code's definition of security. But they also emphasize that, even if the deemed dividends are not securities, the Estate's claims against the Debtors nevertheless arise from the purchase or sale of securities, or the rescission of a purchase or sale of securities, of the Debtors. That's because the claims arise either from the 2013

10

stock-for-stock exchange between BPC and Linn, the 1986 retirement of VHC's stock in BPC, or the 1931 bequest of BHC stock into the trust.

We need not address the Debtors' fallback position, because we agree that the deemed dividend interest owned by the Estate is a security interest under the residual clause of the Bankruptcy Code. The residual clause provides that if a claimant's interest does not fit any of the specific examples provided in the Code and is not explicitly excluded from the definition of "security," it will be considered a security if it is any "other claim or interest commonly known as 'security.'" 11 U.S.C. § 101(49)(A)(xiv). We have noted the "broad" nature of the residual clause. *SeaQuest*, 579 F.3d at 418. Under the Bankruptcy Code, interests are securities if they "bear hallmarks of interests commonly known as securities." *Lehman Bros.*, 855 F.3d at 475.

The Second Circuit has observed that "some interests will not perfectly match any of the specific examples in [the Code's definition of security]," and on these occasions, it is of "most significance" that a claimant "ha[s] the same risk and benefit expectations as shareholders." *Id.* at 473–74. "The form in which the equity interest is held is ultimately irrelevant. So long as the claimant's interest enabled him to participate in the success of the enterprise and the distribution of profits, the claim will be subordinated pursuant to section 510(b)." *In re WorldCom, Inc.*, 2006 WL 3782712, at *6 (Bankr. S.D.N.Y. Dec. 21, 2006).

Bennett held greater financial expectations than that of a creditor during his lifetime. The upside of his deemed dividend payments was theoretically limitless, as it tracked the value of the corporation. Further, because he risked receiving nothing at all if the corporation went bankrupt or if the corporation chose not to issue dividends, Bennett faced many of the same risks as a traditional shareholder. True, Bennett did not have the right to vote or participate in corporate management, or to sell or bequeath his deemed

dividend payments to someone else. But even traditional shareholders do not always enjoy all these rights. *See, e.g.*, *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 n.2 (1985). The most fundamental consideration is whether Bennett had "the same risk and benefit expectations as shareholders." *Lehman Bros.*, 855 F.3d at 475. The deemed dividends plainly gave him such expectations. Treating them as securities comports with the broad reading courts have given Section 510(b). *Id.* at 474 ("Several courts have similarly defined 'security' in section 510(b) in terms of an interest tied to a firm's overall success.").

The Estate points out that the Bankruptcy Code's definition of security specifically carves out certain kinds of interests. *See* 11 U.S.C. § 101(49)(B). A profit-sharing agreement that does not require a statement to be filed with the Securities and Exchange Commission is among the interests excepted under the statute. *Id.* § 101(49)(A)(xii), (B)(vi). But nothing guaranteed Bennett a share of profits. The only obligation undertaken by the company was to pay Bennett a percentage of profits if the company chose to issue dividends. In other words, the deemed dividends only entitled Bennett to receive profits when other shareholders of BPC were receiving profits. That is not a profit-sharing agreement. We conclude that the Estate's deemed dividends are properly considered securities under the Code.

### iii.

The final question is whether the Estate's claims arise from the purchase or sale of a security of the debtor. "For a claim to 'arise from' the purchase or sale of a security, there must be some nexus or causal relationship between the claim and the sale." *SeaQuest*, 579 F.3d at 421 (citing *Telegroup*, 281 F.3d at 138). This is a "broad reading" of the "arise from" requirement. *Id.* Further, because courts have found the "arising from" language in the statute to be ambiguous, the policy goals of the statute must be considered. *Id.* "[T]he fact

that the claims in the case seek to recover a portion of claimants' equity investment is the most important policy rationale." *Id.* That's because, "[w]hen an investor seeks *pari passu* treatment with the other creditors, he disregards the absolute priority rule, and attempts to establish a contrary principle that threatens to swallow up this fundamental rule of bankruptcy law." *Id.* at 421–22 (quotation omitted). "When a claimant elects to take an equity stake in the debtor, he becomes bound by the choice to trade the relative safety of a fixed return for the upside potential of shareholder status." *Id.* at 422 (quotation omitted).

The Debtors suggest that under this broad standard, but-for causation is all that is required for a claim to arise from the purchase or sale of securities. The cases support their position, at least where subordination is consistent with the policy behind the statute. *Id.* at 425 ("S&J correctly observes that it was owed a debt under the October 3 Settlement Agreement, but that debt would not exist *but for* the rescission of its equity investment in SeaQuest. Based on the facts of this case, subordinating the S&J claim is consistent with the primary policy rationale underlying § 510(b)." (emphasis added) (citing *Telegroup*, 281 F.3d at 142)); *see also Telegroup*, 281 F.3d at 138 ("[T]he text of § 510(b) is reasonably read to encompass the claims in this case, since the claims would not have arisen *but for* the purchase of Telegroup's stock and allege a breach of a provision of the stock purchase agreement." (emphasis added)).

Clearly, but for the 1931 stock bequest, the 1986 Victory Trust, or the 2013 deal, the Estate would not have a right to demand the deemed dividends in the bankruptcy proceeding. Each of those transactions counts as a purchase or sale—or, in the case of the 1986 transaction, the rescission of a purchase or sale—of securities of the Debtors. Of those transactions, however, the 2013 deal is the "purchase or sale" of securities to be focused on. It is the nearest in

time and the transaction most directly responsible for the Estate's claims. And there can be no serious dispute that "some nexus or causal relationship" exists between the Estate's claims and the 2013 deal. *See Am. Hous. Found.*, 785 F.3d at 155.

"A claim (no matter how it is characterized by the claimant) arises from a securities transaction so long as the transaction is part of the causal link leading to the alleged injury." *Lehman Bros.*, 855 F.3d at 478; *see also Med Diversified*, 461 F.3d at 257–59 (holding that section 510(b) applies to a claim arising from a failed securities transaction even though the claimant never received shares in the debtor). And in this circuit, it is irrelevant that some of the claims may be "predicated on post-issuance conduct." *Am. Hous. Found.*, 785 F.3d at 154 (quotation omitted). Regardless of whether the Estate's claims are premised on the Debtors' pre- or post-deal conduct, the 2013 deal is part of the causal link leading to the alleged injuries.

Finally, the policies underlying Section 510(b) also support subordination of the Estate's claims. Deciding which transaction the claims "arise from" is less important than determining whether the interest the Estate seeks to recoup is more like an investor's interest or more like a creditor's interest. *See Telegroup*, 281 F.3d at 142 ("More important than the timing of the actionable conduct, from a policy standpoint, is the fact that the claims in this case seek to recover a portion of claimants' equity investment."). Although the Estate is correct that the deemed dividend payments do not fit perfectly in the investor box, the interest the Estate enjoyed in BHC, BPC, and then in Linn or Berry was certainly more like an investor's interest than a creditor's interest.

Allowing the Estate to be treated *pari passu* with creditors would upset the equity cushion those creditors relied on when extending credit and would undermine the Bankruptcy Code's absolute priority rule. Subordinating the

Estate's claims is consistent with the central policy underlying Section 510(b). *See Am. Hous. Found.*, 785 F.3d at 153; *SeaQuest*, 579 F.3d at 420 ("While the creditor anticipates repayment of a fixed debt, the investor anticipates a potentially unlimited share of future profits.").

## IV.

The Estate argues that the bankruptcy court's refusal to permit discovery constituted error and violated due process. "A court's decision to limit discovery is reviewed for abuse of discretion." *Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 261 (5th Cir. 2011).

The bankruptcy court did not abuse its discretion in denying discovery. It assumed all the Estate's claims were true for purposes of reaching its decision. The undetermined issues the Estate identifies in its brief either are legal issues, the resolution of which would not have been aided by additional discovery, or are irrelevant. The bankruptcy court's ruling was akin to a decision on a Rule 12(b)(6) standard. Discovery would not have been helpful. For the same reasons, the Estate's due process right to discovery was not violated.

AFFIRMED.