16-1296-bk (L), 16-1360-bk, 16-1361-bk, 16-1363-bk, 16-1365-bk
*In re: Lehman Bros.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2016

(Argued:  January 4, 2017      Decided:  May 4, 2017)

Docket Nos. 16-1296-bk, 16-1304-bk, 16-1306-bk, 16-1360-bk, 16-1361-bk, 16-1363-bk, 16-1365-bk, 16-1367-bk

———————————————————

IN RE: LEHMAN BROTHERS HOLDINGS INC.,
*Debtor*.

———————————————————

Jennifer Adler, Ian Anderson, Jennifer Becker, Craig Benson, Paola Biraschi, Karen Brewer, William Broadbent, David Brooks, Guillemette Callies, Patrick Cremin, Michael Collier, Joseph D'Amadeo, John Dmuchowski, Nestor De Jesus, Steven Engel, Louise Goldberg, Michael Gran, Anshuman Goyal, Adrian Graves, Sandra Hahn-Colbert, Gregg Hawes, Nicholas Howard, Julian Iragorri, Harriet Chan King, Karen Krieger, Tal Lev Ari, Yeruchim Levilev, Sarah Lewis, Patricia Luken, Lawrence McCarthy, Michael McCully, Paul Shotton, Steven Schwab, Colin S.A. Welch, Pierluigi Volini, Ian Neville, Sandy Fleischman Richman, Jeffrey Wecker, Norman Siegel, Thomas O'Sullivan, Peter Ward, Timothy Wilkinson, Milan Veleba, Andrea Sullivan, Hugh McGee, Judith Winchester, Ross Shapiro, Stephen Snelling, Brian Seward, Margaret Smith, Alvaro Santodomingo, Helmut Olivier, (Estate of) Michael Mullen, Jack Rivkin, Barry Porter, Gregg Somma, Christiane Schuster, Michael Petrucelli, Martin Patterson, Fabio Liotti, Mary Langevin, Amit K. Sarkar, Darian J. Cohen, Lars P. Jacobson, Christian E. Stevens, Andrew Wideman, Madelyn Antoncic, Michele Bareggi, Riccardo Banchetti, Timothy A. Burke, Nachiketa Das, Philippe Dufournier, Brian Gross, Peter Hornick, Andrea Jao, Michael Lawsky, Alexandre Catalao Maia, Nikki Marshall, Richard Noble, Anke Parr, Vincent Primiano, Giancarlo Saronne, Johnathan Sebiri, Charles Spero, Harshad Shah, Gordon Sweely, Rocco F. Andriola, Morgan Lawrence, Nicole Lawrence, Marvin C. Schwartz, Stephanie

Stiefel, Richard J. Glasebrook, II, Judith Ann Kenney, Richard Nackerson, Henry Ramallo, Christian Reynolds, David I. Weiner, Richard Levine, Seth Finkel,
*Claimants-Appellants*,

Virgilio Casuple, Donald Boughrum, Brian Monahan, Roger Saks,
*Claimants*,

v.

Lehman Brothers Holdings Inc.,
*Debtor-Appellee.*[*]

Before:    JACOBS, SACK, AND CARNEY, *Circuit Judges*.

When Lehman Brothers Holdings Inc. filed for Chapter 11 bankruptcy on September 15, 2008, thousands of its employees held restricted stock units, i.e., compensatory awards that gave employees a contingent right to own Lehman Brothers common stock at the conclusion of a five-year holding period. Because these had been awarded between 2003 and 2008, the employees holding them at the time Lehman Brothers filed for Chapter 11 did not receive common stock. The filing effectively rendered their restricted stock units worthless. Many of the affected employees filed proofs of claim in the bankruptcy proceeding seeking cash payments in amounts reflecting the face value of the restricted stock units. Lehman Brothers filed omnibus objections to these claims, and the bankruptcy

---

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to conform with the above caption.

court (James M. Peck, *Judge*) sustained the objections on the ground, *inter alia*, that the claims must be subordinated to the claims of general creditors pursuant to 11 U.S.C. § 510(b) because the former arise from the purchase or sale of securities. The district court (Richard J. Sullivan, *Judge*) affirmed. We conclude that the claims at issue must be subordinated pursuant to 11 U.S.C. § 510(b) because, within the meaning of that statute, (1) restricted stock units are securities, (2) the claimants acquired them in a purchase, and (3) the claims for damages arise from that purchase or the asserted rescission thereof. Accordingly, the district court's judgment is

AFFIRMED.

RICHARD J. SCHAGER, JR. (Andrew R. Goldenberg, *on the briefs*), Stamell & Schager, LLP, New York, NY, *for the Claimant-Appellants Jennifer Adler, Ian Anderson, Jennifer Becker, Craig Benson, Paola Biraschi, Karen Brewer, William Broadbent, David Brooks, Guillemette Callies, Patrick Cremin, Michael Collier, Joseph D'Amadeo, John Dmuchowski, Nestor De Jesus, Steven Engel, Louise Goldberg, Michael Gran, Anshuman Goyal, Adrian Graves, Sandra Hahn-Colbert, Gregg Hawes, Nicholas Howard, Julian Iragorri, Harriet Chan King, Karen Krieger, Tal Lev Ari, Yeruchim Levilev, Sarah Lewis, Patricia Luken, Lawrence McCarthy, Michael McCully, Paul Shotton, Steven*

*Schwab, Colin S.A. Welch, Pierluigi Volini, Ian Neville, Sandy Fleischman Richman, Jeffrey Wecker, Norman Siegel, Thomas O'Sullivan, Peter Ward, Timothy Wilkinson, Milan Veleba, Andrea Sullivan, Hugh McGee, Judith Winchester, Ross Shapiro, Stephen Snelling, Brian Seward, Margaret Smith, Alvaro Santodomingo, Helmut Olivier, (Estate of) Michael Mullen, Jack Rivkin, Barry Porter, Gregg Somma, Christiane Schuster, Michael Petrucelli, Martin Patterson, Fabio Liotti, and Mary Langevin.*

LISA M. SOLOMON, Law Offices of Lisa M. Solomon, New York, NY, *for the Claimants-Appellants Madelyn Antoncic, Michele Bareggi, Riccardo Banchetti, Timothy A. Burke, Nachiketa Das, Philippe Dufournier, Brian Gross, Peter Hornick, Andrea Jao, Michael Lawsky, Alexandre Catalao Maia, Nikki Marshall, Richard Noble, Anke Parr, Vincent Primiano, Giancarlo Saronne, Johathan Sebiri, Charles Spero, Harshad Shah, Gordon Sweely, Rocco F. Andriola, Amit K. Sarkar, Darian J. Cohen, Lars P. Jacobson, Christian E. Stevens, and Andrew Wideman.*

DEBORAH E. LANS, Cohen Clair Lans Greifer Thorpe & Rottenstreich LLP, New York, NY (Eugene Neal Kaplan, Kaplan Landau, LLP, New York, NY, *on the briefs*), *for the Claimants-Appellants Marvin C. Schwartz, Stephanie Stiefel, Richard J. Glasebrook, II, Judith Ann Kenney, Richard Nackerson, Henry Ramallo, Christian Reynolds, David I. Weiner, Richard Levine, and Seth Finkel.*

RALPH I. MILLER, Weil, Gotshal & Manges LLP, New York, NY, *for Debtor-Appellee Lehman Brothers Holdings Inc*.

SACK, *Circuit Judge*:

It is not uncommon for corporate employers to compensate their high-ranking employees not only with cash, but also with equity in the corporation. Such arrangements align the employees' financial incentives with those of the company:  If the company succeeds financially, so too do its stake-holding employees; but if the company falters—even to and beyond the point of bankruptcy—its employees bear some of the loss.  Prior to its bankruptcy filing, Lehman Brothers Holdings Inc. ("Lehman Brothers") adopted this approach, compensating many of its employees in part with restricted stock units ("RSUs"), which gave them a contingent right to own Lehman Brothers common stock at the conclusion of a five-year holding period.  The holder of an RSU had risk and return expectations similar to those of a shareholder; he or she would ultimately benefit from any increase in the stock price or suffer from any decline.

When Lehman Brothers filed for Chapter 11 bankruptcy on September 15, 2008—the largest bankruptcy filing in United States history[1]—thousands of its employees were holding RSUs that had been awarded over the preceding five years, but that had not yet vested and had therefore apparently been rendered worthless by the bankruptcy filing. Many of these employees filed proofs of claim in the Chapter 11 proceeding seeking cash payments in the amounts of and as substitutes for compensation they had been paid in RSUs. Lehman Brothers filed omnibus objections to the claims, and the United States Bankruptcy Court for the Southern District of New York (James M. Peck, *Judge*) sustained these objections on two alternative grounds. First, it concluded that because the claims arise from the purchase or sale of securities, they must be subordinated to the claims of general creditors pursuant to section 510(b) of the Bankruptcy Code, 11 U.S.C. § 510(b). Second, the court decided that because an RSU is an "equity security," 11 U.S.C. § 101(16), the employees' claims were disallowed insofar as the claimants, as equity security holders, may assert only proofs of interest, not

---

[1] *See ANZ Sec., Inc. v. Giddens (In re Lehman Bros. Inc.)*, 808 F.3d 942, 944 (2d Cir. 2015) ("On September 15, 2008, Lehman Holdings filed for Chapter 11 bankruptcy protection—the largest bankruptcy filing in U.S. history.").

proofs of claim. The United States District Court for the Southern District of New York (Richard J. Sullivan, *Judge*) affirmed on both grounds.

We note at the outset that we need not determine whether an RSU is an "equity security" pursuant to 11 U.S.C. § 101(16), because, even if it is, RSU holders are not barred from asserting proofs of claim—such as the breach-of-contract claims asserted here—inasmuch as at least some of their claims are not duplicative of proofs of interest. We conclude, however, that Lehman Brothers' omnibus objections must nonetheless be sustained on the alternative ground that, pursuant to section 510(b), the claims must be subordinated to the claims of general creditors because, for purpose of this statute, (1) RSUs are securities, (2) the claimants acquired them in a purchase, and (3) the claims for damages arise from those purchases or the asserted rescissions thereof.

## BACKGROUND

Lehman Brothers paid many of its employees a portion of their compensation in RSUs,[2] equity awards that gave each of the recipient employees a contingent right to own Lehman Brothers common stock five years after

---

[2] Lehman Brothers awarded RSUs to United States employees and contingent stock awards to overseas employees. These forms of equity, though different in name, were identical in substance.

issuance of each RSU so long as certain employment-related conditions were met. When Lehman Brothers filed for Chapter 11 bankruptcy on September 15, 2008, many of its employees were holding RSUs that had not yet vested. They filed proofs of claim in the bankruptcy proceedings for cash payments equivalent to the amounts they had received in RSUs.

### *The Program*

The RSUs were awarded in accordance with Lehman Brothers' Equity Award Program (the "Program"), which was administered by Lehman Brothers' Board of Directors' Compensation and Benefits Committee (the "Committee"). The Program's purpose was to give Lehman Brothers' employees (1) a financial stake in the company that aligned their interests with those of the company, and (2) a financial incentive to remain with the company until the RSUs matured.

In accordance with those goals, the Program gave Lehman Brothers discretion to pay some of its employees a portion of their compensation in equity-based awards, including RSUs.[3] "At [Lehman Brothers'] option, a portion of [an employee's] total compensation . . . may be payable in the form of

---

[3] Near the end of each fiscal year, employees received a brochure with a schedule identifying the portion of their compensation they would be paid in RSUs, based on the employee's corporate title and compensation level.

conditional equity awards ([RSUs], stock options, or other equity awards) pursuant to the [Program]." Joint App'x ("JA") at 7 ¶ 2. And where Lehman Brothers had employment contracts with its employees, those contracts stated that "[a]t the Firm's discretion, a portion of [the employees'] total . . . compensation . . . will be [or may be] payable in conditional equity awards ([RSUs] and/or other equity awards) pursuant to the [Program]." *Id.* In practice, RSUs were awarded near the end of each year to some employees. These RSU holders were entitled to Lehman Brothers common stock at the conclusion of a five-year holding period, assuming they met certain employment-related conditions. Employees whose RSUs vested at the end of the five-year holding period could dispose of their shares of common stock as they saw fit.

The Program was governed by the terms of various documents, including the Employee Incentive Plan (the "Plan"). Section 8(b) of the Plan provides in pertinent part that Lehman Brothers' RSU obligation is limited to delivery of the stock, and does not include payment of cash:

> With respect to any [RSUs] granted under the Plan, the obligations of the Company or any Subsidiary are limited solely to the delivery of shares of Common Stock on the date when such shares of Common Stock are due to be delivered under each Agreement, and in no event shall the Company or any Subsidiary become obligated to pay cash in respect of such obligation (except that the Company or any Subsidiary may pay to [Plan] Participants amounts in cash in respect of a restricted stock unit equal to cash dividends paid to a holder of shares of Common Stock, for fractional shares or for any amounts payable in cash upon the occurrence of a Change in Control).

*Id*. at 2890. Section 13(b) further provides that "[t]he grant of an Award shall not be construed as giving a Participant the rights of a stockholder of Common Stock unless and until shares of Common Stock have been issued to Participants pursuant to Awards hereunder." *Id*. Section 16 provides additional information about the rights of Plan participants, and authorizes the creation of trusts to meet Plan obligations:

> With respect to any payments not yet made to a Participant, . . . nothing herein contained shall give any Participant any rights that are greater than those of a general creditor of the Company. In its sole discretion, the Committee may authorize the creation of trusts or other arrangements to meet the obligations created under the Plan to deliver Common Stock or payments in lieu thereof . . . .

*Id.* at 2891.

During the five-year holding period, the common stock was held in a trust, established and governed by a Trust Agreement, which provides that the "assets[,] including [s]hares, that shall be held therein" are "subject to the claims

10

of the Company's general creditors in the event the Company becomes insolvent . . . until paid to Participants . . . in such manner and at such times as the Company may specify to fulfill [its] obligations under the Plans." *Id.* at 1835. Section 1(e) of the Trust Agreement subjects the trust assets to claims of general creditors:

> The principal of the Trust, and any earnings thereon, . . . shall be used exclusively for the uses and purposes of Participants and general creditors as herein set forth. Participants shall have no preferred claim on, or any beneficial ownership interest in, any assets of the Trust. Any rights created under the Plans and this Agreement shall be mere unsecured contractual rights of Participants against the Company. Any assets held by the Trust will be subject to the claims of the Company's general creditors under federal and state law in the event the Company becomes insolvent . . . .

*Id.* at 1836. Section 3(b) reiterates that, "[a]t all times during the continuance of this Trust, . . . the principal and income of the Trust shall be subject to claims of general creditors of the Company under federal and state law" in accordance with the provisions of the Trust Agreement. *Id.* at 1838.

Program documents for the years 2003 and 2004 (but not after) included provisions ("Subordination Provisions") explicitly stating that, "in the event of bankruptcy," RSU-holder claims would be "deemed . . . claims for damages arising from the purchase or sale of [Lehman Brothers c]ommon [s]tock[] within the meaning of section 510(b) . .  and shall have in such bankruptcy the same

11

priority as, and no greater priority than, common stock interests in [Lehman Brothers]." *Id*. at 52 ¶ 10, 57 ¶ 10. The record on appeal does not appear to disclose why, after 2004, the Program documents no longer included these Subordination Provisions.

Employees received annual notice of the Program's terms by way of information packets containing a summary of the Program's material terms and a Program brochure.[4] These brochures stated, *inter alia*, that an RSU "represents [a] conditional right to receive one share of Lehman Brothers common stock," which "the firm holds on [an employee's] behalf for five years, which [he or she] will be entitled to receive at that time, provided [the employee] meet[s] certain terms and conditions." *Id*. at 36, 37.

Although common stock was not issued until the completion of a five-year period,[5] RSU holders received benefits similar to those of shareholders. They were paid dividends in the form of additional RSUs during the five-year period, and Program documents indicate that they could direct the trustee's votes on the

---

[4] Employees were also notified of the Program's terms via face-to-face communications, conference calls, and e-mail.

[5] RSU holders did not incur income tax liability on the value of their RSUs until they vested.

shares held in the trust in proportion to the number of RSUs each owned. The value of their RSUs, moreover, was directly tied to the value of Lehman Brothers' common stock: If the stock's value increased during the five-year holding period, RSU holders would benefit from that increase; if the stock's value decreased during that same period, they would ultimately bear the loss.

### *The Dispute*

When Lehman Brothers filed for Chapter 11 bankruptcy on September 15, 2008, thousands of Lehman Brothers employees were holding RSUs that had not yet vested, having been granted for services performed between 2003 and 2008. Many RSU holders filed proofs of claim in the bankruptcy proceeding seeking cash payments equivalent to the amounts previously paid to them in RSUs. In response, Lehman Brothers filed fourteen omnibus objections seeking to reclassify over 3,000 RSU-based claims as equity interests and to subordinate them to the claims of general creditors. Most of the claimants did not oppose Lehman Brothers' objections, and accordingly, the United States Bankruptcy Court for the Southern District of New York reclassified their claims as equity.

But 222 of the claimants opposed the objections. The bankruptcy court therefore held a hearing on December 21, 2011, where it indicated that it would

follow the reasoning of *In re Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006), which held "that claims for damages that arise from the ownership of employee stock options . . . should be subordinated [to the claims of general creditors] pursuant to section 510(b)," *id*. at 144, unless the claimants could establish that their RSUs were meaningfully different from the stock options at issue in *Enron*. The bankruptcy court directed the parties to develop a factual record in this regard. And in April 2014, at the conclusion of more than a year of discovery, the bankruptcy court conducted a three-day evidentiary hearing at which it heard live testimony from six witnesses. The parties then submitted supplemental briefs.

On November 3, 2014, the bankruptcy court (Shelley C. Chapman, *Judge*)[6] issued a decision sustaining Lehman Brothers' omnibus objections on two alternative grounds. *See In re Lehman Bros. Holdings Inc.*, 519 B.R. 47, 67 (Bankr. S.D.N.Y. 2014), *aff'd*, 548 B.R. 663 (S.D.N.Y. 2016). First, it held that the RSU-based claims, like the claims at issue in *Enron*, must be subordinated pursuant to section 510(b). *See id*. at 59-65. Second, it held that because the RSUs are equity

---

[6] On February 1, 2014, these cases were transferred to Judge Chapman upon Judge Peck's retirement from the bench. *See Lehman Bros.*, 519 B.R. at 51 n.4.

securities under section 101(16) of the Bankruptcy Code, the claimants may assert only proofs of interest—not proofs of claim—against the debtor. *See id*. at 65-67.

Thereafter, some of the claimants appealed the bankruptcy court's decision to the United States District Court for the Southern District of New York. And on March 30, 2016, the district court issued an opinion and order affirming the bankruptcy court's decision on both grounds. *In re Lehman Bros. Holdings Inc.*, 548 B.R. 663, 671, 673 (S.D.N.Y. 2016).

Three sets of claimants, representing a portion of the remaining claimants and each represented by different counsel, appealed from the judgment of the district court: (1) the Adler Claimants,[7] (2) the Antoncic Claimants,[8] and (3) the

---

[7] The Adler Claimants comprise: Jennifer Adler, Ian Anderson, Jennifer Becker, Craig Benson, Paola Biraschi, Karen Brewer, William Broadbent, David Brooks, Guillemette Callies, Patrick Cremin, Michael Collier, Joseph D'Amadeo, John Dmuchowski, Nestor De Jesus, Steven Engel, Louise Goldberg, Michael Gran, Anshuman Goyal, Adrian Graves, Sandra Hahn-Colbert, Gregg Hawes, Nicholas Howard, Julian Iragorri, Harriet Chan King, Karen Krieger, Tal Lev Ari, Yeruchim Levilev, Sarah Lewis, Patricia Luken, Lawrence McCarthy, Michael McCully, Paul Shotton, Steven Schwab, Colin S.A. Welch, Pierluigi Volini, Ian Neville, Sandy Fleischman Richman, Jeffrey Wecker, Norman Siegel, Thomas O'Sullivan, Peter Ward, Timothy Wilkinson, Milan Veleba, Andrea Sullivan, Hugh McGee, Judith Winchester, Ross Shapiro, Stephen Snelling, Brian Seward, Margaret Smith, Alvaro Santodomingo, Helmut Olivier, (Estate of) Michael Mullen, Jack Rivkin, Barry Porter, Gregg Somma, Christiane Schuster, Michael Petrucelli, Martin Patterson, Fabio Liotti, and Mary Langevin.

[8] The Antoncic Claimants comprise: Madelyn Antoncic, Michele Bareggi, Riccardo Banchetti, Timothy A. Burke, Nachiketa Das, Philippe Dufournier, Brian Gross, Peter

Neuberger Claimants.[9] The pertinent facts are essentially the same with respect to all three sets, with one exception: The Neuberger Claimants became Lehman Brothers employees (and RSU holders) when Lehman Brothers acquired Neuberger Berman, an investment management firm. As former managing directors of Neuberger Bergman, they are subject to restrictive non-compete covenants. They assert that they had no real choice but to accept RSUs as part of their compensation because the acquisition forced them to become Lehman Brothers employees, and the restrictive non-compete covenants effectively forced them to remain employed at Lehman Brothers.

## DISCUSSION

The bankruptcy and district courts addressed the subordination issue before considering whether the claims at issue here are disallowed because the claimants are equity security holders. We address these two issues in the reverse order because we think it more appropriate to determine whether the asserted

---

Hornick, Andrea Jao, Michael Lawsky, Alexandre Catalao Maia, Nikki Marshall, Richard Noble, Anke Parr, Vincent Primiano, Giancarlo Saronne, Johathan Sebiri, Charles Spero, Harshad Shah, Gordon Sweely, Rocco F. Andriola, Amit K. Sarkar, Darian J. Cohen, Lars P. Jacobson, Christian E. Stevens, and Andrew Wideman.

[9] The Neuberger Claimants comprise: Marvin C. Schwartz, Stephanie Stiefel, Richard J. Glasebrook, II, Judith Ann Kenney, Richard Nackerson, Henry Ramallo, Christian Reynolds, David I. Weiner, Richard Levine, and Seth Finkel.

claims are disallowed full stop, before considering whether they must be subordinated; an affirmative answer to the first question could preclude the need to answer the second. We conclude, however, that the claims at issue are not categorically disallowed because at least some of the claims are distinct from any equity security interests the claimants may otherwise hold, but that the claims must nonetheless be subordinated pursuant to section 510(b).

## I.   Standard of Review

"We exercise plenary review over a district court's affirmance of a bankruptcy court's decision, reviewing *de novo* the bankruptcy court's conclusion of law, and reviewing its findings of fact for clear error." *ANZ Sec., Inc. v. Giddens (In re Lehman Bros. Inc.)*, 808 F.3d 942, 946 (2d Cir. 2015) (internal quotation marks omitted).[10]  A finding of fact is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985) (internal quotation marks omitted).  "Where there are two permissible views of the

---

[10] Although *Giddens* also arose out of Lehman Brothers' bankruptcy proceedings and involved the subordination of claims pursuant to section 510(b), the specific legal issues there are not relevant here.

evidence, the factfinder's choice between them cannot be clearly erroneous." *Id*. at 574.

## II. Permissibility of the Claims

A debtor in bankruptcy may file an "omnibus objection" to purported claims on the ground they are "interests, rather than claims." Fed R. Bankr. P. 3007(d)(7). The Bankruptcy Code defines a "claim" as a "right to payment . . . or . . . an equitable remedy," 11 U.S.C. § 101(5), whereas an "equity security" is, as relevant here, a "share in a corporation, whether or not transferrable or denominated 'stock,' or similar security," or a "warrant or right, other than a right to convert, to purchase, sell, or subscribe to [such an interest]," *id*. § 101(16)(A), (C). Those with "claims" against a debtor are "creditors," *id*. § 101(10), and those with "equity securities" of the debtor are "equity security holders," *id*. § 101 (17). Thus, an interest in an equity security is distinct from a claim to a right to payment or an equitable remedy. *See In re Pine Lake Vill. Apartment Co.*, 21 B.R. 478, 480 (Bankr. S.D.N.Y. 1982) (distinguishing an interest in an equity security from "a claim against the debtor for which the equity holder may assert a right to payment").

But under some circumstances, an equity security holder may assert both an interest and a claim relating to that interest. *See* 2 COLLIER ON BANKRUPTCY ¶ 101.16 (Alan N. Resnick & Henry J. Sommer eds., 16 ed.) (explaining that "the holder of an equity security may also hold a claim that relates to or arises out of an equity security"). If an equity security holder, "out of confusion," "file[s] [a] proof[] of claim"—instead of a proof of interest—the claim is "properly disallowed" as "duplicative" of a proof of interest. *USA Capital Realty Advisors, LLC v. USA Capital Diversified Trust Deed Fund, LLC (In re USA Commercial Mortg. Co.)*, 377 B.R. 608, 615 (B.A.P. 9th Cir. 2007). But where an equity security holder asserts "[a] proof of claim . . . for breach of contract [or] fraud relating to the purchase of a security," that claim "is . . . not duplicative of the equity holder's proof of interest" and may therefore be allowed, notwithstanding the claimant's status as an equity security holder. *Id*. (distinguishing between equity security holders' proofs of interest and proofs of claim).

Here, the bankruptcy court determined that an RSU constitutes an "equity security" pursuant to section 101(16); on this basis alone, it held that the claimants' proofs of claim must be disallowed. *See Lehman Bros.*, 519 B.R. at 65-67 ("[T]he [claimants] assert an interest based on equity securities, and, accordingly

19

do not assert a 'claim' at all under the Bankruptcy Code."). This reasoning skips a step: Even assuming that RSU holders do have the right to assert proofs of interest insofar as RSUs constitute equity securities, it does not necessarily follow that the proofs of claim asserted by the claimants must be disallowed. They might be allowed if they are not duplicative of an asserted interest in an equity security. *See USA Commercial Mortg.*, 377 B.R. at 615. And in our view, at least some of the breach-of-contract claims at issue here fall into this category.

The claimants assert, for example, that Lehman Brothers breached its contractual obligation to compensate them insofar as it did not pay them the cash value of the RSUs that never vested. This breach-of-contract claim, whatever its merits, is analytically distinct from any equity interest the claimants may or may not have in the RSUs. Thus, we need not resolve whether an RSU is an "equity security" pursuant to section 101(16) because, regardless of how we answer that question, the claimants are permitted to bring at least some of the claims at issue here.

## III. Subordination of Claims

Although equity security holders may assert claims related to, but distinct from, their equity security interests, such claims are not necessarily on a par with

other claims against the debtor. They must be subordinated if they are governed by section 510(b), which provides:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, [or] for damages arising from the purchase or sale of such a security, . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).

Section 510(b) safeguards the absolute priority rule, a bedrock principle of bankruptcy law, under which creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets. *See Motorola, Inc. v. Official Comm. of Unsecured Creditors and JPMorgan Chase Bank, N.A. (In re Iridium Operating LLC)*, 478 F.3d 452, 463 (2d Cir. 2007) (explaining that, under the absolute priority rule, "any plan of reorganization in which stockholders are preferred before the creditor is invalid" (internal quotation marks and brackets omitted)); Elizabeth Warren, *Bankruptcy Policy*, 54 U. Chi. L. Rev. 775, 793 (1987) (explaining that "[t]he [Bankruptcy] Code provides that the equity owners participate in distributions or maintain ownership interests following reorganization only if the creditors have been paid in full or . . . consent to their

continued ownership[,]" in accordance with the "almost axiomatic principle . . . that, because equity owners stand to gain the most when a business succeeds, they should absorb the costs of the business's collapse—up to the full amount of the investment").[11]  Section 510(b) preserves the absolute priority rule by ensuring that security holders may not gain parity with creditors simply by alleging claims that arise from the purchase of their securities.  *See* 4 COLLIER ON BANKRUPTCY ¶ 510.04 ("The clear mandate of section 510(b) is that shareholder claimants will not be permitted to elevate their interests from the level of equity to general claims.").

To that end, we construe section 510(b) broadly.  *See Rombro v. Dufrayne (In re Med Diversified, Inc.)*, 461 F.3d 251, 255-59 (2d Cir. 2006).  We do so in light of the statute's legislative history, specifically the House Report on the 1978 Bankruptcy Reform Act, H. Rep. No. 95-595, Bankruptcy Reform Act of 1978 (1977) ("House Report"), which, in adopting the language contained in the Act,

---

[11] Although various Bankruptcy Code provisions reflect the absolute priority rule, it is particularly prominent in 11 U.S.C. § 1129(b)(2)(B), which "provides that a reorganization plan may not give 'property' to the holders of any junior claims or interests 'on account of' those claims or interests, unless all classes of senior claims either receive the full value of their claims or give their consent."  *DISH Network Corp. v. DBSD North America, Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 88 (2d Cir. 2011) (quoting 11 U.S.C. § 1129(b)(2)(B)).

relied on an article by John J. Slain and Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261 (1973) ("Slain and Kripke").[12] *See* House Report at 196 (explaining that "[t]he bill generally adopts [the] Slain[ and ]Kripke position"); *see also Med Diversified*, 461 F.3d at 255-56. The House Report reflects Congress's apparent view that claims should be subordinated where, *inter alia*, the claimant "took on the risk and return expectations of a shareholder, rather than a creditor." *Id*. at 256.[13] Thus we held in *Med Diversified* that section 510(b) required subordination of fraud

---

[12] Slain and Kripke conceptualized the subordination principle ultimately adopted in section 510(b) in terms of the absolute priority rule:

> In theory, the general creditor asserts a fixed dollar claim and leaves the variable profit to the stockholder; the stockholder takes the profit and provides a cushion of security for payment of the lender's fixed dollar claim. The absolute priority rule reflects the different degree to which each party assumes a risk of enterprise insolvency; no obvious reason exists for reallocating that risk.

Slain and Kripke, *supra*, at 286-87.

[13] The House Report also suggests that Congress sought to subordinate claims "seek[ing] to recover a contribution to the equity pool presumably relied upon by creditors in deciding whether to extend credit to the debtor." *Med Diversified*, 461 F.3d at 256.

and breach-of-contract claims arising from a debtor's alleged failure to issue common stock in the debtor in exchange for the claimant's shares in another company inasmuch as the claimant had taken on the "risk and return expectations of a shareholder" by "bargain[ing] not for cash but to become a stockholder in the debtor"; we explained that he "became bound by the choice he made to trade the relative safety of cash compensation for the upside potential of shareholder status—the very choice highlighted by Slain and Kripke." *Id*.

In *Med Diversified*, we also cited with approval *In re Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006), a thorough and well-reasoned bankruptcy court decision applying section 510(b) to fraud and breach-of-contract "claims by employees for damages they allegedly suffered when, due to the debtor's fraud, they chose not to exercise stock options immediately when they vested but to hold onto the options with hopes for future higher returns." *Med Diversified*, 461 F.3d at 257 ("Helpful too is the recent and extraordinarily thorough decision in *In re Enron*[.]").  Adopting a broad construction of section 510(b) premised on Slain and Kripke, *Enron*, 341 B.R. at 163-65, the *Enron* court concluded, *inter alia*, that (1) a stock option is a "security" within the meaning of section 510(b) insofar as it meets the definition of that term set forth in 11 U.S.C. § 101(49)(A)(xv) (providing

that the term "security" includes a "warrant or right to subscribe to or purchase or sell[] a security"), *id.* at 149-50; and (2) the employees "purchase[d]" the stock options within the meaning of section 510(b) inasmuch as they "willingly accepted [them] in return for their labor," even though they "were required to receive [them as] a portion of their compensation," *id*. at 151. The court therefore held that the breach-of-contract claim arising from their stock options must "be subordinated under section 510(b)." *Id*. at 161. In reaching that result, it explained that allowing parties to "recharacterize" equity-based claims as breach-of-contract claims of a creditor would undermine the purpose of section 510(b): "to prevent shareholders and other securityholders from bootstrapping their equity interests to a level on [a] par with general creditors and thus sharing equally in the distribution of the bankrupt estate." *Id*.

In light of the analysis set forth in *Med Diversified* and *Enron*, the claims at issue here must be subordinated pursuant to section 510(b) if each of the following three conditions is met: (1) RSUs are securities, (2) the claimants acquired them in a purchase, and (3) the claims for damages arise from that purchase or the asserted rescission of it. We address each in turn, and ultimately conclude that subordination is appropriate.

## A. RSUs as Securities

At the threshold lies the question whether an RSU of the sort at issue here constitutes a "security," as that term is defined by the Bankruptcy Code. *See* 11 U.S.C. § 101(49). We conclude that it does.

Section 101(49) contains two subsections. Subsection (A) enumerates fifteen interests "include[d]" in the definition of a "security": Fourteen of these are specific examples, *see id*. § 101(49)(A)(i)-(xiii), (xv);[14] the fifteenth is a residual clause that covers any "other claim or interest commonly known as 'security,'" *id*. § 101(49)(A)(xiv). Subsection (B) enumerates seven items excluded from the

---

[14] The enumerated examples of a "security" are:

> (i) note; (ii) stock; (iii) treasury stock; (iv) bond; (v) debenture; (vi) collateral trust certificate; (vii) pre-organization certificate or subscription; (viii) transferable share; (ix) voting-trust certificate; (x) certificate of deposit; (xi) certificate of deposit for security; (xii) investment contract or certificate of interest or participation in [certain types of] profit-sharing agreement[s] or [leases for] oil, gas, or mineral royalt[ies] . . . ; (xiii) interest of a limited partner in a limited partnership; . . . [and] (xv) certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase or sell, a security[.]

11 U.S.C. 101(49)(A).

definition of a security, *see id*. § 101(49)(B)(i)-(vii);[15] it does not include a residual clause.

As a practical matter, some interests will not perfectly match any of the specific examples in either list, and it will not immediately be clear whether they are "securities." On these occasions, it should be borne in mind that the interests specifically enumerated in subsection (A) do not exhaust the universe of securities within the meaning of the Bankruptcy Code. This is clear from the text of subsection (A), which provides that "[t]he term 'security' . . . *includes*" the items listed, *id*. § 101(49)(A) (emphasis added), where the term "'includes' . . . [is] not [a] limiting" term, *id*. § 102(3). Thus, as other courts have recognized, the statutory

_____

[15] The specific examples expressly excluded from the definition of "security" are:

> (i) currency, check, draft, bill of exchange, or bank letter of credit; (ii) leverage transaction, as defined in section 761 of this title; (iii) commodity futures contract or forward contract; (iv) option, warrant, or right to subscribe to or purchase or sell a commodity futures contract; (v) option to purchase or sell a commodity; (vi) contract or certificate of a kind specified in subparagraph (A)(xii) of this paragraph that is not required to be the subject of a registration statement filed with the Securities and Exchange Commission and is not exempt under section 3(b) of the Securities Act of 1933 from the requirement to file such a statement; or (vii) debt or evidence of indebtedness for goods sold and delivered or services rendered.

11 U.S.C. § 101(49)(B).

list of securities set forth in subsection (A) is "non-exclusive." *O'Donnell v. Tristar*

*Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*, 488 B.R. 394, 399 (B.A.P.

9th Cir. 2013) (concluding that a membership interest in an LLC is a "security"),

*aff'd*, 782 F.3d 492 (9th Cir. 2015); *see also O'Cheskey v. Templeton (In re Am. Hous.*

*Found.)*, No. 09-20232-RLJ-11, Adv. No. 10-02016, 2013 WL 1316723, at *18, 2013

Bankr. LEXIS 1449, at *50-51 (Bankr. N.D. Tex. Mar. 30, 2013) (concluding that the

enumerated list in section 101(49) is not exhaustive and that securities are not

limited to the items specifically identified), *aff'd in part, rev'd in part on other*

*grounds*, 785 F.3d 143 (5th Cir. 2015).  Indeed, the residual clause set forth in

subsection (A)(xiv) clearly opens the door to securities not specifically listed.  *See*

11 U.S.C. § 101(49)(A)(xiv) (providing that the term "security" includes any "other

claim or interest commonly known as [a] 'security'"); *see also SeaQuest Diving, LP*

*v. S&J Diving, Inc. (In the matter of SeaQuest Diving, LP)*, 579 F.3d 411, 418 (5th Cir.

2009) (observing that subsection (A)(xiv) is a "broad residual category").

An argument can be made that an RSU of the sort at issue qualifies as a

security pursuant to one of the specific examples enumerated in subsection (A),

namely that it is a "certificate of interest or participation in, temporary or interim

certificate for, receipt for, or warrant or right to subscribe to or purchase or sell, a

security."  11 U.S.C. § 101(49)(A)(xv); *see also id*. § 101(49)(A)(ii) (identifying "stock" as a "security").  As the bankruptcy court explained, "a grant of an RSU constitutes a contingent right to participate in, receive [or] purchase [Lehman Brothers] common stock" "once certain employment-related conditions have been satisfied."  *Lehman Bros.*, 519 B.R. at 60 (citing various Program documents).  But even assuming that the claimants' RSUs do not fall squarely within subsection (A)(xv)[16]—or any of the other enumerated examples in subsection (A)—we think that they nevertheless qualify as securities pursuant to the residual clause.  *See* 101 U.S.C. § 101(49)(A)(xiv).

We reach this conclusion on the ground that, in certain important respects, the claimants' RSUs resemble other securities specifically enumerated in subsection (A), *see United States v. Amato*, 540 F.3d 153, 160 (2d Cir. 2008) (explaining that, under the canon of construction *ejusdem generis*, "general terms that follow specific ones are interpreted to embrace only objects of the same kind

---

[16] The claimants contend that subsection (A)(xv) does not cover an RSU because an RSU merely grants its holder a *contingent* or *conditional* right to receive stock upon the occurrence of certain events rather than an absolute right to participate in or subscribe to a stock.  We do not find this argument persuasive because subsection (A)(xv) makes no distinction between conditional rights and absolute rights; nor have the claimants made any persuasive showing why we should read such a distinction into the text of the statute.

or class as the specific ones"), *cert denied*, 556 U.S. 1138 (2009). Indeed, these RSUs bear many of the hallmark characteristics of a security. Like many security holders, the RSU holders had limited voting rights[17] and received any declared dividends in the form of additional RSUs.[18] And of most significance, they had the same risk and benefit expectations as shareholders because the value of their RSUs was tied to the value of Lehman Brothers' common stock. Each RSU holder therefore had "greater financial expectations than [a] creditor" inasmuch as a "creditor can only recoup her investment," whereas an RSU holder "expect[ed] to

---

[17] The claimants assert that they did not have voting rights, but fail to cite any record evidence supporting their assertion. The documentary evidence on which the bankruptcy court relied, *see Lehman Bros.*, 519 B.R. at 56, reflects that Lehman Brothers established a trust, funded with shares to be issued upon the conversion of RSUs to common stock, that gave RSU holders the ability to direct voting on those shares based on the proportion of the number RSUs held by the employees. *See, e.g.*, JA at 2616 (2003 Program); *id*. at 2862 (2005 Program).

[18] The record reflects that (1) RSU dividends accrued quarterly and were reinvested as additional RSUs; (2) upon the issuance of common stock, the RSU holder received additional common stock in proportion to the dividend equivalents that had accrued during the five-year period; and (3) any additional RSUs awarded for dividend equivalents were not treated as income by Lehman Brothers or accounted for as a compensation expense of Lehman Brothers.

participate in firm profits." *Med Diversified*, 461 F.3d at 257 (internal quotation

marks omitted).[19]

Several courts have similarly defined "security" in section 510(b) in terms

of an interest tied to a firm's overall success. *See, e.g., KIT digital, Inc. v. Invigor

Grp. Ltd. (In re KIT digital, Inc.)*, 497 B.R. 170, 183 (Bankr. S.D.N.Y. 2013) (treating

a debtor's obligation to pay stock to a claimant as a security under section 510(b)

because, "by agreeing to accept stock instead of cash[,] . . . [the claimant]

subjected itself to the greater risk that the price of the stock it would then receive

might go down" while ensuring that it "would get the benefits if the price of the

stock went up"); *In re Club Ventures Inv. LLC*, No. 11-10891 (ALG), 2012 WL

6139082, at \*5, 2012 Bankr. LEXIS 5742, at \*20 (Bankr. S.D.N.Y. Dec. 11, 2012)

(holding that unissued membership units representing a future interest in an

LLC after certain conditions were met constituted "securities" subject to section

510(b) because the units "would have given [the claimant] certain rights to share

in the [d]ebtor's profits[] and . . . the risk and reward expectations of an equity

---

[19] The fact that RSUs were not taxed as ordinary income until the end of the five-year holding period, when the vested common stock was taxed according to its market value at the time of vesting, further supports the conclusion that RSUs were equity interests without a fixed valued.

holder"); *Aristeia Capital, L.L.C. v. Calpine Corp. (In re Calpine Corp.)*, No. 05-60200 (BRL), 2007 WL 4326738, at *13, 2007 U.S. Dist. LEXIS 86514, at *38 (Bankr. S.D.N.Y. Nov. 21, 2007) ("The value of the [convertible notes] var[ies] with the value of the common stock of [the debtor], and therefore resemble[s] an equity interest to which [s]ection 510(b) is applicable.").[20]

We therefore conclude that the claimants' RSUs are securities within the meaning of section 510(b) because they meet the definition of that term set forth in section 101(49)(xiv) insofar as they bear hallmarks of interests commonly known as securities.[21]

---

[20] The claimants rely on three cases in which claims were not subordinated under section 510(b), but they are inapposite because here, unlike in those cases, the value of RSUs rose and fell with the value of common stock. *See Racusin v. Am. Wagering, Inc. (In re Am. Wagering, Inc.)*, 493 F.3d 1067, 1071 (9th Cir. 2007) (involving a claim arising from a pre-bankruptcy money judgment against the debtor, which resulted from the debtor's failure to fulfill its obligation to pay the claimant cash in the fixed amount of "4% of the final evaluation of the [company's] IPO" (internal quotation marks omitted)); *Raven Media Invs., LLC v. DirecTV Latin America, LLC (In re DirecTV Latin America, LLC)*, No. 03-10805 (PJW), Civ. 03-981-SLR, 2004 WL 302303, at *4, 2004 U.S. Dist. LEXIS 2425, at *13 (D. Del. Feb. 4, 2004) (involving a claim arising out of a "[p]ut [a]greement" that effectively gave the claimant the benefits of holding stock without "expos[ing] [it] to any risk of loss"); *In re NationsRent, Inc.*, 381 B.R. 83, 86, 91-93 (Bankr D. Del. 2008) (involving claims based on a "[m]ake-[w]hole" agreement to pay cash in the fixed amount of the stock price at a particular date).

[21] We pause to emphasize that we should not be understood to conclude that any interest called an "RSU" is necessarily a security within the meaning of section 510(b), let alone any other statute. As our analysis indicates, the requisite inquiry in each case

*B. Purchase of Security*

We must next decide whether the claimants received the RSUs through a "purchase or sale." 11 U.S.C. § 510(b). We think they did insofar as Lehman Brothers awarded the claimants the RSUs as compensation for their labor.

The term "purchase" in section 510(b) is properly construed broadly to include circumstances where a claimant has received equity securities in exchange for labor. *See Enron*, 341 B.R. at 151 ("While it is true that the [c]laimants did not purchase the stock options on the open market, they nonetheless exchanged value for the options: here, their labor. Such exchange falls under a broad reading of the term 'purchase.'"); *see also Med Diversified*, 461 F.3d at 258 (noting that the rationale for mandatory subordination "applies even if there is no actual sale or purchase" of securities (internal quotation marks omitted)); *Liquidating Trust v. Wax (In re U.S. Wireless Corp.)*, 384 B.R. 713, 719 (Bankr. D. Del. 2008) ("[T]he Equity Package [the claimant] received as a portion of his compensation, i.e., in exchange for his labor, constitutes a purchase and sale of a security for the purpose of section 510(b)."); *In re Touch Am. Holdings,*

is likely to be fact-intensive, and the result will turn on the substance of the particular "RSU" and the relevant legal definition of "security"—and that definition is likely to vary from statute to statute.

*Inc.*, 381 B.R. 95, 104 (Bankr. D. Del. 2008) (broadly interpreting "purchase" and noting that "[s]tock given to an employee as compensation nonetheless involves a bargain and exchange of value" (internal quotation marks omitted)).[22]

The claimants "purchased" RSUs within the meaning of section 510(b) by agreeing to receive them, in lieu of cash, in exchange for a portion of their labor. As the bankruptcy court determined, "although the RSU [c]laimants had the option to leave employment at Lehman, they elected voluntarily not to do so primarily because of the high cost associated with leaving—i.e., leaving unvested equity awards 'on the table' [and] the inability to make as much money anywhere else." *Lehman Bros.*, 519 B.R. at 60-61. By agreeing to work for Lehman Brothers, the claimants voluntarily accepted that Lehman Brothers had the

---

[22] The proposition that a security can be purchased with an employer's labor also accords with the Bankruptcy Code's expansive definition of "purchaser" as a "transferee of a voluntary transfer," 11 U.S.C. § 101(43), where "transfer" is to be construed as "broad[ly] as possible." S. Rep. No. 95-989, at 27 (1978); *see also* 11 U.S.C. § 101(54) (defining "transfer" as, among other things, "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with . . . an interest in property"). Similarly, the Uniform Commercial Code, on which section 101(43) is based, broadly defines "purchase" as "taking by sale, discount, negotiation, mortgage, pledge, lien, security interest, issue or re-issue, gift or *any other voluntary transaction* creating an interest in property." 2 COLLIER ON BANKRUPTCY ¶ 101.43 (emphasis added) (quoting U.C.C. § 1-201(29)).

discretion to pay part of their total compensation in RSUs.[23]  *Cf. Enron*, 341 B.R. at 151 (concluding that the claimants purchased securities insofar as they "willingly accepted," as "a condition of [their] employment," "a portion of their compensation as [stock] options . . . in return for their labor").

In arguing otherwise, the claimants point to *International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Daniel*, 439 U.S. 551 (1979), in which the Supreme Court held that participation in a compulsory and noncontributory pension plan does not constitute an investment decision within the meaning of the Securities Act or the Securities Exchange Act, *id*. at 559-60. Other courts, also in the context of federal securities law, have extended *Daniel* to compulsory and involuntary employee stock option plans.  *See, e.g.*, *McLaughlin v. Cendant Corp. (In re Cendant Corp. Sec. Litig.)*, 76 F. Supp.2d 539, 545 (D. N.J. 1999) (holding that the "[p]laintiff did not receive her options as part of a bargained-for exchange that required her to make an affirmative investment

---

[23] The claimants were on notice that they could be compensated in part with RSUs. The employee handbooks reflect that "[a]t the Firm's option, a portion of [an employee's] total compensation . . . may be payable in the form of conditional equity awards ([RSUs], stock options, or other equity awards) pursuant to the [Program]."  JA at 7 ¶ 2.  And where Lehman Brothers had employment contracts with its employees, those contracts stated that "[a]t the Firm's discretion, a portion of [the employees'] total compensation . . . will be payable in conditional equity awards ([RSUs] and/or other equity awards) pursuant to the [Program]."  *Id*.

decision" where her "participation in the option plan was an incident of employment and [her] only [other] choice would have been to [forgo] the receipt of benefits entirely" (internal quotation marks omitted) (second brackets in original)).

Here, however, *Daniel* is a glove that does not fit. It focused on whether employees made an investment decision that could be influenced by fraud or manipulation; the present case poses the distinct question whether equity was purchased through labor for purposes of subordination in bankruptcy. No case has been cited by the parties—nor have we found one—in which a court has applied the *Daniel* principle to section 510(b). And the claimants fail to make a compelling argument why the holding of *Daniel* should be extended beyond the context of federal securities laws so as to contravene the lesson of *Med Diversified* and *Enron*: Section 510(b) should be broadly construed in light of its purpose, *see Med Diversified*, 461 F.3d at 255-59, to include circumstances where a claimant has received a security in exchange for labor, *Enron*, 341 B.R. at 150-51.[24]

---

[24] Even if we were to apply *Daniel* and *Cendant* here, it is far from clear that those cases would help the claimants. Both involved retirement plans offered to employees who were already compensated for their labor. *See Daniel*, 439 U.S. at 553-54 (explaining that the pension plans were part of a collective bargaining agreement and were separate and independent from the plaintiffs' compensation); *Cendant*, 76 F. Supp.2d at 544

The Neuberger Claimants argue that, whatever can be said of the means by which the other claimants acquired RSUs, they did not voluntarily purchase them. They urge that when Lehman Brothers acquired Neuberger Berman, they had no realistic choice but to continue employment with Lehman Brothers' subsidiary because not doing so would have required them to forfeit their previously earned equity in Neuberger Berman, and to abandon their careers in light of pre-existing non-compete covenants imposed by Neuberger Berman. We do not find this argument persuasive. As the bankruptcy court reasoned, "beginning with the merger and every day thereafter, the Neuberger [] Claimants," exactly like the other claimants, "had the choice to 'vote with their feet' against the terms of the Program by leaving Lehman [Brothers]." *Lehman Bros.*, 519 B.R. at 62. That they considered this option to be less rewarding than remaining employed by Lehman Brothers does not mean that they had no choice

(explaining that the "plaintiff acquired her options when she was already employed by Cendant under a plan that offered the options not to her as an individual, but as a member of an employee group"). By contrast, in *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555 (2d Cir. 1985) (Friendly, J.), we held that an employee "purchased" stock options within the meaning of the federal securities laws where she accepted employment in return for a salary of $40,000 plus options to purchase up to 30,000 shares of the employer's stock. *Id*. at 560. The case at bar more closely resembles *Yoder* than it does *Daniel* or *Cendant* because the RSUs at issue here were not mere benefits, but instead were a significant portion of the claimants' bargained-for compensation.

in the matter; it means that they "made an economic decision based on rational self-interest." *Id*.

Nor can the Neuberger Claimants successfully argue economic duress under New York law, a doctrine "reserved for extreme and extraordinary cases," *VKK Corp. v. NFL*, 244 F.3d 114, 123 (2d Cir. 2001), where the party asserting economic duress can show "(1) threats of an unlawful act by one party [that] (2) compel[] performance by the other party of an act [that] it had a legal right to abstain from performing," *Chase Manhattan Bank v. New York*, 13 A.D.3d 873, 874, 787 N.Y.S.2d 155, 157 (3d Dep't 2004).  And even in the unlikely event that they could meet these requirements,[25] the Neuberger Claimants have waived any economic duress argument by failing to seek prompt repudiation of the terms of their 2003 agreement with Lehman Brothers.  *See VKK Corp.*, 244 F.3d at 123 (explaining that "it is well established under New York law that a party asserting duress must do so promptly" and that "[d]elays as short as six months have been

---

[25] Indeed, the Neuberger Claimants have failed to show anything unlawful about their arrangement with Lehman Brothers, including their non-compete agreements, which had limited one- to three-year restriction periods and were applicable only to Lehman Brothers' market. *See Cardwell v. Thermo Fischer Scientific*, No. 09 Civ. 7809 (DAB), 2010 WL 3825711, at *7, 2010 U.S. Dist. LEXIS 108302, at *20 (S.D.N.Y. Sept. 23, 2010) (stating that "New York Courts have held restrictions of up to five years to be reasonable depending on the circumstances," and holding that a one-year non-compete covenant was reasonable).

held to constitute forfeiture of the claim") (internal quotation marks and citation omitted)).  The Neuberger Claimants' assertion of economic duress many years after entering the agreement is untimely.

Thus, within the meaning of section 510(b), we conclude that all the claimants purchased their RSUs by voluntarily choosing to receive them in exchange for a portion of their labor.

*C. Arising from the Purchase of a Security*

Finally, we must address whether the claims at issue are claims for damages arising from the purchase of a security pursuant to section 510(b).  We conclude that they are.

Section 510(b) provides that claims "arising from" a securities transaction must be subordinated.  In light of the well-settled principle that this provision is to be interpreted broadly, *see Med Diversified*, 461 F.3d at 257-58, courts have concluded that section 510(b) covers "a wide variety of causes of action arising out of securities transactions."  4 COLLIER ON BANKRUPTCY ¶ 510.04 (collecting cases).  A claim (no matter how it is characterized by the claimant) arises from a securities transaction so long as the transaction is part of the causal link leading to the alleged injury.  *See, e.g., Med Diversified*, 461 F.3d at 257-59 (holding that

section 510(b) applies to a claim arising from a failed securities transaction even though the claimant never received shares in the debtor); *Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 143-44 (3d Cir. 2002) (concluding that section 510(b) applied to a claim arising from the debtor's failure to register shares after the securities transaction had been completed); *In re Worldcom, Inc.*, 329 B.R. 10, 14 (Bankr. S.D.N.Y. 2005) ("So long as the nature of the damage or harm complained of by a shareholder can be said to result as a consequence of his having purchased or sold shares of stock or other securities of the debtor, the claimant falls within the scope of [s]ection 510(b)[.]"); *Queen v. Official Comm. of Unsecured Creditors (In re Response U.S.A., Inc.)*, 288 B.R. 88, 94 (D. N.J. 2003) (concluding that breach-of-contract claims must be subordinated where "they would not exist but for the [purchase of the security]," despite the claimants' attempt to characterize themselves as "creditors who seek payment based on a contract").

We think section 510(b) applies to all claims asserted here—and characterizations thereof—because they would not have arisen but for the claimants' agreement with Lehman Brothers to receive part of their compensation in the form of RSUs.

The claimants advance a variety of theories in opposition to this conclusion. We find none of them to be persuasive.

*1. Alternative Performance*

The claimants first assert that they have alternative-performance claims against Lehman Brothers to be paid in cash in exchange for their labor because the RSUs they received never vested. These claims, they contend, do not arise from the purchase of a security within the meaning of section 510(b), but are instead general-creditor claims for cash owed in exchange for services rendered.

This theory finds no support in the Program documents under the terms of which Lehman Brothers had the discretion to pay a portion of the claimants' compensation with RSUs; those documents also make clear that once Lehman Brothers chose to award RSUs in this manner, it had no further obligation to pay cash for that same portion of compensation.[26] Its only remaining obligation was

---

[26] As noted above, the employee handbooks provide that "[a]t the Firm's option, a portion of [an employee's] total compensation . . . may be payable in the form of conditional equity awards ([RSUs], stock options, or other equity awards) pursuant to the [Program]," JA at 7 ¶ 2; and where Lehman Brothers had employment contracts with its employees, those contracts made clear that "[a]t the Firm's option, a portion of [the employee's] total compensation (combined base salary, bonus and other compensation) may be payable in the form of restricted stock units pursuant to . . . the standard terms and provisions of the Program[,]" *id*. at 2596; *see also id*. at 2575-76 ¶ 2 (same).

to deliver stock to the RSU holders at the conclusion of the five-year period, assuming the specified conditions were met.  In this regard, the Plan provides:

> With respect to any [RSUs] granted under the Plan, the obligations of the Company or any Subsidiary are limited solely to the delivery of shares of Common Stock on the date when such shares of Common Stock are due to be delivered under each Agreement, and in no event shall the Company or any Subsidiary become obligated to pay cash in respect of such obligation . . . .[27]

JA at 2890 § 8(b); *see also id*. at 3505 § 8(b) (same).  The Trust Agreement further reflects that RSU holders are distinct from general creditors insofar as the assets held in the trust, including the shares held for RSU holders, are "subject to the claims of the Company's general creditors in the event the Company becomes insolvent."  *Id*. at 1835, 1838.

The claimants point to the following language of the Plan as evidence that RSU holders are to be treated as general creditors:  "With respect to any payments not yet made to a [p]articipant, . . . nothing herein contained shall give any [p]articipant any rights that are greater than those of a general creditor . . . ."

---

[27] There is a discretionary exception to this limited obligation to deliver stock to RSU holders, but it is not applicable here.  *See* JA at 2890 § 8(b) (explaining that, "upon the occurrence of a Change in Control," Lehman Brothers "may pay to Participants amounts in cash in respect of a[n RSU] equal to cash dividends paid to a holder of shares of Common Stock, for fractional shares or for any amounts payable in cash").

*Id*. at 2891 § 16.  But this provision does not support the claimants' assertion.  Its plain language reflects no more than that the participants' rights may not be *greater* than those of general creditors, not that they may not be *less* than—or subordinate to—the rights of general creditors.  The provision, moreover, applies by its own terms only to "any payments not yet made to a [p]articipant," *id*., which, in light of the other Program documents already described, clearly refers to circumstances where Lehman Brothers has not yet paid its employees—either in cash or in RSUs—for services rendered.  The provision does not apply where, as here, Lehman Brothers has already made payments to the claimants for all services rendered, either in the form of cash or RSUs.

In sum, we conclude that the claimants cannot assert claims arising from anything other than the purchase of RSUs because they have already been paid the compensation they were due in the form of RSUs and, as a result, have no right to any other mode of performance.  Once they received RSUs, their only right vis-à-vis Lehman Brothers was for the delivery of stock at the conclusion of the five-year holding period, assuming the specified employment-related

conditions were met. They therefore cannot avoid subordination of their claims under section 510(b).[28]

*2. Restitution*

Nor can the claimants circumvent section 510(b) by asserting restitution claims. In light of the failure of their alternative-performance theory, their strongest argument for restitution appears to be that: (1) Lehman Brothers, by filing for bankruptcy, repudiated its contractual condition to issue stock to RSU holders (who presumably satisfied their own employment-related conditions); and (2) as a result, RSU holders are entitled to recover in restitution for the reasonable value of the services they rendered to Lehman Brothers. Yet, under Delaware law, which governs the construction of the Program documents, *see* JA at 68, a breach-of-contract claim requires "damage to the plaintiff" resulting from

---

[28] The alternative-performance theory could also be characterized as an argument that the award of RSUs did not constitute a payment in exchange for the claimants' labor, despite the Program documents. Such an argument, however, is effectively a contention to rescind the contractual arrangement to which the claimants agreed so that they may be paid in cash—and only cash—for the services they rendered. Whatever the merits of this argument, it does not change the outcome here because a claim for rescission—like a claim for damages—is subject to section 510(b). *See* 11 U.S.C. § 510(b) ("[A] claim arising from rescission of a purchase or sale of a security of the debtor . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security . . . .").

the breach, *VLIW Tech., L.L.C. v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). Although the claimants were theoretically wronged by not receiving the Lehman Brothers shares they were owed, those shares became worthless once Lehman Brothers filed for bankruptcy. They therefore suffered no actual injury because the only thing to which they were contractually entitled—shares of Lehman Brothers common stock—had no value. This defeats their breach-of-contract claim and, thus, their right to restitution.[29]

---

[29] Even if the claimants could allege an actual injury, their restitution claims might nonetheless be subordinated under section 510(b) inasmuch as those claims are functionally equivalent to a claim for rescission or a claim for damages, both of which are expressly covered by section 510(b). "As a remedy for [a] breach [of contract], 'restitution' means either the restoration of a specific thing or the payment in money of the value of a contractual performance by [the claimant]." Henry Mather, *Restitution as a Remedy for Breach of Contract: The Case of the Partially Performing Seller*, 92 YALE L. J. 14, 14 n.1 (1982) (citing Restatement of Contracts § 326(b) (1932)). In the former sense, a "plea for restitution is merely the remedial flip side of [a] rescission claim; rescission will unwind or avoid the transaction, and restitution will put the parties back in their original positions." *Tekinsight.Com, Inc. v. Stylesite Mktg., Inc. (In re Stylesite Mktg., Inc.)*, 253 B.R. 503, 510-11 (Bankr. S.D.N.Y. 2000). A claim for restitution in this sense may well be subject to section 510(b), broadly interpreted, insofar as it is functionally equivalent to a claim for rescission. *See id.* at 511 (explaining that a claim that "depend[s] on [the claimant's] purchase of the [debtor's] stock . . . arise[s] from that purchase" regardless of whether the claimant "chooses to call it" rescission or restitution). Similarly, the second sense in which the term "restitution" can be used as a breach-of-contract remedy—payment measured in terms of the defendant's gain rather than the claimant's loss—might sometimes (though not always) be functionally equivalent to a claim for damages. Restitution, of course, provides for a measure of recovery that is analytically distinct from that of damages. *See In re Gartenberg*, 636 F.2d 16, 17 (2d Cir. 1980) ("Restitution is a remedy distinct from damages and requiring

*3. Subordination Provisions*

Finally, the claimants contend that the deletion of the Subordination Provisions in the Program documents evidences the parties' intention to treat the claimants as general creditors in the event of bankruptcy.

As we have noted, Program documents for 2003 and 2004 included Subordination Provisions explicitly stating that in the event of bankruptcy, claims of RSU holders would be deemed to be claims for damages arising from the purchase or sale of a security pursuant to section 510(b); Program documents for subsequent years, however, did not contain Subordination Provisions. The

---

different proof."); *see also* Douglas Laycock, *Restoring Restitution to the Canon*, 110 MICH. L. REV. 929, 938 (2012) ("The fundamental question in damages . . . is how much a plaintiff lost . . . . But in restitution, . . . [it] is how much [the] defendant was unjustly enriched."). But "[w]hen the restitutionary claim leads to the same recovery as the . . . claim [for damages], there is little reason to distinguish between them." Douglas Laycock, *The Scope and Significance of Restitution*, 67 TEX. L. REV. 1277, 1286 (1989). Indeed, "[w]hen the underlying wrong is the same and the remedy is the same, important collateral issues," such as whether to subordinate claims pursuant to section 510(b), "should not be left open to the option of the clever pleader." *Id*. Here, it appears that the claimants' remedy would be the same whether awarded as damages or as restitution. Indeed, in making their restitution argument, the claimants contend that the proper measurement for recovery is the amount of cash that Lehman Brothers could have paid them in lieu of RSUs, the very same amount they seek in damages by means of their alternative-performance theory. *See supra*. In this regard, the restitution theory seems to be merely a new bottle for old vinegar; the two theories appear to be functionally the same. To be clear, though, this is not the basis on which we reject the claimants' restitution argument; we reject it because the claimants are unable to allege an injury.

claimants assert that this history supports a conclusion that (at least after 2004)

the parties intended for the claimants to be treated as general creditors.  But this

assertion rests entirely on speculation.  The claimants cite, and we ourselves see,

no record evidence establishing the reason for the removal of the Subordination

Provisions.[30]  There is thus no basis to conclude that the removal of these

provisions reflects the parties' intention to treat RSU holders as general creditors

in the event of insolvency.

* * *

In sum, we conclude that the claimant's' RSU-based claims—no matter

how they are characterized—must be subordinated pursuant to section 510(b)

because they arise from the purchase or sale of securities.  The claimants "took on

the risk and return expectations of . . . shareholder[s], rather than . . . creditor[s],"

*Med Diversified*, 461 F.3d at 256, by agreeing to be paid a portion of their

---

[30] As the bankruptcy court found at the evidentiary hearing, the parties adduced: (1) "no evidence as to why the Subordination Provisions are not contained in the Program Documents after 2004"; (2) "no evidence that the decision to omit [them] arose from any intent by [Lehman Brothers] to declare that [RSU-based claims] would cease to be subject to . . . section 510(b) . . . if a Chapter 11 proceeding should ever arise"; and (3) "no evidence that the [claimants] relied upon the omissions of the Subordination Provisions when making the choice to continue employment at Lehman [Brothers]." *Lehman Bros.*, 519 B.R. at 64.

compensation in RSUs.  They are thus "bound by the choice [they] made to trade the relative safety of cash compensation for the upside potential of shareholder status," *id*., and the risk of loss—even bankruptcy—that accompanies that status.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.